UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
BARBARA FONTANEZ,

                    Plaintiff,

         - against -

CAROLYN W. COLVIN ACTING
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.
-------------------------------------------------------x

**<u>MEMORANDUM & ORDER</u>**
16-CV-01300 (PKC)

PAMELA K. CHEN, United States District Judge:

      Plaintiff Barbara Fontanez ("Plaintiff") brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final determination of the Commissioner of Social Security (the "Commissioner" or "SSA") that Plaintiff is not entitled to Supplemental Security Income ("SSI") disability benefits under Title XVI of the Social Security Act. The parties have cross-moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Dkts. 16, 22.) Plaintiff seeks reversal of the Commissioner's decision and remand for further administrative proceedings. The Commissioner, in turn, seeks to have the Court affirm the Commissioner's disability determination.

      For the reasons set forth below, the Court GRANTS Plaintiff's motion for judgment on the pleadings and DENIES the Commissioner's motion. The case is remanded for further proceedings consistent with this opinion.

# BACKGROUND

## I. Procedural History

On May 8, 2013, Plaintiff applied for SSI alleging disability due to depression, back injury, allergies, and asthma. (Tr. 220–25, 234.)[1] On January 9, 2015, the ALJ, Marilyn Hoppenfeld, held a hearing at which testimony was heard from Plaintiff, a non-examining State agency medical expert, and a vocational expert. (Tr. 31.) The ALJ issued a written decision on September 17, 2015, concluding that Plaintiff was not disabled and therefore not entitled to SSI benefits. (Tr. 5– 30.) On January 11, 2016, the ALJ's decision became the Commissioner's final decision when the Appeals Council of the Office of Disability Adjudication and Review denied Plaintiff's request for review in accordance with the terms of the class action settlement agreement in *Padro v. Astrue*, No. 11-CV-1788 (CBA), 2013 WL 5719076 (E.D.N.Y. Oct. 1, 2013).[2] (Tr. 1–3.) Plaintiff timely commenced this action on March 16, 2016, and cross-motions for judgment on the pleading were fully briefed on April 21, 2017. (*See* Docket No. 16-CV-1300.)

## II. Non-Medical History and Plaintiff's Self-Reports

### A. Plaintiff's Personal and Employment History

Plaintiff was born on September 10, 1970, and was forty-one on the onset date of her alleged disability, September 8, 2011. (Tr. 24, 220, 230.) She completed up to tenth grade in high school (Tr. 52), and she had worked temporarily, in 2000, as a census-taker for the United States Census Bureau, where she would walk for three and a half hours, stand for thirty minutes, climb

---

[1] "Tr." refers to the Administrative Transcript, Dkt. 11.

[2] While Plaintiff's Memorandum of Law (Dkt. 16-1) refers to the case as *Padro v. Colvin*, No. 11-CV-1788 (CBA) (E.D.N.Y. Oct. 1, 2013), the Court refers to the case as *Padro v. Astrue*, No. 11-CV-1788 (CBA), 2013 WL 5719076 (E.D.N.Y. Oct. 1, 2013), the class action in which the class members complained of systematic bias by ALJs in the Queens, New York office of the Social Security Administration.

for thirty minutes, write, type or handle small objects for four hours, and reach for four hours, in a day. (Tr. 235–36.) In 2007, for about six months, she worked part-time as a mail clerk. (Tr. 54–55.) Plaintiff has four children and lives with three of them. (Tr. 43.) One of her sons, now fourteen years old, is disabled and suffers from cerebral palsy, seizure, and developmental delay. (Tr. 44.)

### B. Plaintiff's Self-Reporting in Her Social Security Application

#### 1. July 19, 2013 Disability Report

In her July 19, 2013 disability report, Plaintiff stated that she was unable to work due to depression, back injury, allergies, and asthma. (Tr. 234.) She reported that she was taking the following medications: Zoloft for depression, ibuprofen and Tylenol for pain, methocarbamol for back and hip pain, albuterol for asthma, calcium, and iron for anemia, and Prevacid for acid reflux. (Tr. 237.) Plaintiff reported she had been in the emergency room once in 2010 and once in July 2013. (Tr. 237.)

#### 2. August 2, 2013 Function Report

In a function report dated August 2, 2013, Plaintiff reported that she was able to dress, bathe, feed herself, and use the toilet without any assistance. (Tr. 243–44.) She did not need any special help or reminders to take care of her personal needs and grooming, but required help remembering to take her medication. (Tr. 244.) She could do chores such as cleaning, laundry, and household repairs, but needed help from family members. (Tr. 245.) Due to back pain, she had difficulty sleeping, could no longer take care of her son with special needs, and could not stand long enough to prepare her own meals. (Tr. 243–44.) Plaintiff did not go out alone because she experienced dizziness and was afraid she would pass out. (Tr. 245.) She was generally able to manage household finances. (Tr. 246.) She reported that her pain, anxiety, and depression made it difficult to spend time and get along with others. (Tr. 247.) She had trouble finishing what she

started and remembering things. (Tr. 249–50.) Plaintiff described her pain, presumably in her lower back,[3] as stabbing and aching, and explained that waking up, walking, standing, and sitting for extended amounts of time triggered the pain. (Tr. 250–51.) Her pain had worsened over time, and the pain could be described as "needlelike," "shooting," and "chronic." (Tr. 251.) Plaintiff reported to taking a number of medications, including Acetaminophen, ibuprofen, Robaxin, and Tramadol, which helped only temporarily. (Tr. 251.) Plaintiff reported experiencing headaches about four to five times a month, which caused nausea, sensitivity to light and sound, and sometimes blurred vision. (Tr. 253.) She reported that she received treatment for headaches once at Jamaica Hospital Medical Center ("JHMC"). (Tr. 252.) She had been diagnosed with depression and anxiety, and such conditions were triggered in crowded areas as well as by stress. (Tr. 253–54.) She described her depression and anxiety to cause shaky hands, palpitation, nervousness, confusion, disorientation, and crying. (Tr. 254.)[4]

### C. Other Reports

1. <u>August 30, 2013 FedCap Biopsychosocial Evaluation Summary</u>

On August 30, 2013, Plaintiff was examined by Dr. Jesus Navarro, an internal medicine specialist, at FedCap Rehabilitation Services ("FedCap"), a New York City Human Resources Administration public assistance program that provides advocacy for claimants seeking federal disability benefits.[5] (Tr. 464–500.) Plaintiff reported that she had difficulty walking, standing, climbing stairs, and sometimes grooming, bathing, and dressing due to back pain. (Tr. 472.)

---

[3] Plaintiff did not specify which parts of her body were affected by the pain.

[4] Plaintiff listed similar complaints in a later disability report dated October 2013. (Tr. 266–72.)

[5] For an overview of FedCap, *see* http://www.fedcap.org/content/wecare (last visited July 11, 2017).

Plaintiff also reported that she had had anxiety since the 1990's and depression since 2011. (Tr. 482.) Plaintiff was observed to be groomed and responsive during the interview. (Tr. 475.)

In the evaluation summary, Dr. Navarro noted Plaintiff's back, leg, joint, and muscle pain, stiffness, swelling, and limitation of movement. (Tr. 486.) He noted that Plaintiff did not experience neck pain. (Tr. 484.) Dr. Navarro also conducted a physical examination, where he assessed abnormal musculoskeletal functions in range of motion, strength, and tone. (Tr. 490.) He noted that Plaintiff experienced continuous, moderate levels of pain in her lumbar spine, left hip, and left knee. (*Id*.) As a result, Dr. Navarro concluded that Plaintiff had physical limitations in standing, walking, pushing, pulling, sitting, reaching, kneeling, squatting, and bending. (Tr. 491.) He also concluded that Plaintiff had emotional and cognitive limitations due to depression, respiratory limitations due to asthma, and other general limitations in her capacity to maintain energy level, sustain attendance, and achieve adequate work pace and productivity due to her medical conditions and use of a cane. (Tr. 492–93.) Dr. Navarro diagnosed Plaintiff with sprains and strains of hip, thigh, knee, leg, and parts of the back, asthma, migraine, and episodic mood disorders. (Tr. 496–98.) He concluded that Plaintiff was "unable to work." (Tr. 498.)

2. September 12, 2013 Function Report

Plaintiff's FedCap case manager and non-attorney representative, Cooper Goodman, completed a third-party function report. (Tr. 273–81.) According to the report, Plaintiff's day consisted mainly of resting and supervising other people who took care of her son with special needs because Plaintiff's medical conditions significantly limited her physical capacity. (Tr. 273.) She was no longer able to dress and bathe herself, nor was she able to use public bathrooms because the toilets were too low. (Tr. 274.) Similarly, Plaintiff could not perform household chores. (Tr. 275–76.) Her physical limitations—inability to walk, stand, prepare food, and perform any form of exertion—perpetuated her mental health problems. (Tr. 274.) Her physical limitations also led

her to withdraw from her hobbies and social life. (Tr. 277–78.) Plaintiff reported having difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, concentrating, remembering, completing tasks, understanding, following instructions, and getting along with others. (Tr. 278.) Goodman concluded that Plaintiff had no physical or mental residual functional capacity ("RFC") to perform either relevant past work (*i.e.* poll taker) or other work given her background. (Tr. 281.)

### III.     Medical Evidence Prior to the Filing Date

On October 20, 2011, Plaintiff saw Nurse Practitioner Rosanne Martone for migraine headaches at Richmond Hill Family Medicine ("RHFM") of JHMC. (Tr. 335–36.) Plaintiff reported that her pain was moderate, intermittent, and that it had been gradually worsening. (Tr. 335.) Symptoms included dizziness, phonophobia,[6] and photophobia,[7] but Plaintiff experienced no nausea, vision change or vomiting. (*Id.*) Martone noted Plaintiff's significant medical history of migraine headaches. (*Id.*) At her January 18, 2012 follow-up visit at JHMC with Dr. Thambiraja Nandakumar, a neurologist, Plaintiff reported having headaches twice a week, with associated visual disturbances, nausea, and vomiting. (Tr. 338.) Dr. Nandakumar diagnosed Plaintiff with migraine and prescribed Imitrex.[8] (Tr. 340.) However, within five weeks of being prescribed the medication—even though the medication had been effective—Plaintiff stopped taking it because she was trying to get pregnant. (Tr. 340–42.)

---

[6] Phonophobia refers to abnormal sensitivity to noise, a common feature of migraine headaches. *Phonophobia*, STEDMAN'S MEDICAL DICTIONARY 683710.

[7] Photophobia refers to light-induced pain, especially of the eyes. *Photalgia*, STEDMAN'S MEDICAL DICTIONARY 685690.

[8] Dr. Nandakumar is a neurologist at JHMC. Jamaica Hospital Medical Center, https://jamaicahospital.org/find-a-doctor (last visited July 11, 2017).

Plaintiff returned to RHFM on February 23, 2012, for an annual examination with Dr. David Dovnarsky, Plaintiff's primary care physician. (Tr. 1143.) Dr. Dovnarsky diagnosed her with low back pain, chronic asthma, chronic migraine, chronic depression, GERD (gastroesophageal reflux disease), urinary frequency, and neck swelling. (*Id.*) He advised Plaintiff to take Tylenol and get physical therapy for her low back pain. (Tr. 1147.) It was noted that Plaintiff was getting psychiatric care, but was not taking medication for her depression. (*Id.*) Dr. Dovnarsky ordered a CT scan for her neck and test panels for the depression. (Tr. 1148.)

In addition to regular treatments with Dr. Dovnarsky, Plaintiff received osteopathic manipulation treatment ("OMT") and physical therapy at RHFM from Drs. Jacqueline Marston, a resident physician (Tr. 1169, 1175), Philip Cruz, D.O., an attending sports medicine specialist (Tr. 1216), and Stephanie Ortiz, D.O., a resident physician (Tr. 1723). On February 28, 2012, Plaintiff began OMT for her back pain with Dr. Marston. (Tr. 346.) Plaintiff complained of sharp low back pain on her right side that was aggravated by lying on her back or standing. (Tr. 344.) Dr. Marston noted Plaintiff's mild positive straight leg raise on the right side of her lower back, which improved after the treatment, and diagnosed Plaintiff with psoas syndrome, piriformis syndrome, low back pain, and muscle spasm.[9] (Tr. 345–46.) When Plaintiff returned for a follow-up on March 15, 2012, she exhibited decreased range of motion, tenderness, and spasm in her back. (Tr. 349.) On April 5, 2012, Dr. Marston observed that Plaintiff had not experienced any improvement since the last visit and that Plaintiff had difficulty moving around. (Tr. 1221, 1223.) Plaintiff reported that, although she experienced some improvement immediately after the treatment, the

---

[9] Piriformis syndrome "is a rare neuromuscular disorder that occurs when the piriformis muscle compresses and irritates the sciatic nerve—the largest nerve in the body." https://www.ninds.nih.gov/Disorders/All-Disorders/Piriformis-Syndrome-Information-Page (last visited September 12, 2017).

pain returned "right back." (Tr. 1221.) Her pain score was reported as 10/10. (Tr. 1217.) Drs. Marston and Cruz instructed Plaintiff to stop taking Naproxen and prescribed Cyclobenzaprine and Meloxicam for her back pain. (Tr. 1223.) For the rest of 2012, Plaintiff visited RHFM once or twice a month, generally to treat her back pain, muscle spasm, and to receive OMT. (Tr. 356–382, 1245–463.) Dr. Dovnarsky noted on July 30, 2012, that Plaintiff's migraine condition was "stable." (Tr. 376.)

In a letter dated April 5, 2012, Dr. Marston opined that Plaintiff was suffering from acute chronic back pain from caring for her son and that, "if [her] current conditions continue[d]"— presumably referring to the fact that her apartment was on the second floor, and thus Plaintiff had to carry her son up and down the stairs—Plaintiff's condition would deteriorate to the point where she could not care for herself. (Tr. 443.) Dr. Dovnarsky also wrote a letter, in connection with Plaintiff's request for public assistance, dated June 4, 2012, opining that Plaintiff was unable to work due to chronic back and neck pain, as well as her need to take care of her son with special needs. (Tr. 372, 441.) Dr. Dovnarsky's diagnosis remained mostly the same for the rest of the year, except for the additional assessment of chest pain and slurred speech on June 29, 2012, and of palpitations on October 1, 2012. (Tr. 1354, 1442–45.)

Plaintiff returned to RHFM for asthma and bronchitis on January 9, 2013, and again for an examination and OMT for back pain on January 15, 2013. (Tr. 1469, 1490.) On January 15, 2013, Plaintiff exhibited limited range of motion due to lower back pain and also had tenderness in her lumbar spine S1-L5-L4 segments. (Tr. 1496.) On January 17, 2013, Dr. Ortiz diagnosed Plaintiff with sacral dysfunction and noted that Plaintiff had gone to about ten physical therapy sessions in late 2012, but that the relief was temporary. (Tr. 1518, 1522.) On March 25, 2013, Plaintiff presented with back pain complaining of 10/10 intensity, and reported that she had landed on her

knee when she slipped while lifting her son. (Tr. 1548.) Plaintiff's March 30, 2013 X-ray showed a normal lumbar spine without significant abnormality. (Tr. 429.) An MRI dated April 12, 2013, showed mild degenerative changes at L4-5 and L5-S1. (Tr. 430.)[10] On April 1, 2013, when Plaintiff saw Dr. Dovnarsky for an annual exam, the doctor noted that Plaintiff had the following conditions: depression, asthma, migraine, low back pain, and anemia. (Tr. 395–96, 1601–30.) Plaintiff also reported having sleep disturbance and decreased concentration, and was prescribed Zoloft for her depression. (Tr. 395, 1606.) Plaintiff's migraine condition was noted to be "stable" (Tr. 396, 1607), and "[n]o [ ] tenderness [points in Plaintiff's] back" were found based on a musculoskeletal physical examination. (Tr. 395, 1606.) The next day, however, Dr. Cruz observed decreased range of motion and pain in Plaintiff's back, and administered trigger point injection. (Tr. 397, 1637.)

## IV. Medical Evidence After the Filing Date

For the period after filing for SSI, Plaintiff continued to see Dr. Dovnarsky, her primary care physician at RHFM. For her physical ailments, as previously noted, Plaintiff continued to receive OMT from Drs. Marston (Tr. 1169, 1175), Cruz, D.O. (Tr. 1216), and Ortiz, D.O. (Tr. 1723). She also received nine physical therapy treatments from October 14, 2013 through March 27, 2014. (Tr. 711–97, 865–92, 908–46, 972–1007.) In addition, Plaintiff was treated by two physiatrists, Dr. Svetlana Gavrilova, M.D. and Dr. Vadim Goldshteyn, M.D. at JHMC. (Tr. 716, 799.)

---

[10] The MRI report noted a "very small central disk protrusion . . . with mild facet degenerative changes resulting in mild bilateral neural foramina narrowing" at L4-5, and "a mild bulge with mild facet degenerative changes resulting in mild bilateral neural foramina narrowing," at L5-S1. (Tr. 430.)

## A. Physical Medical History

### 1. Primary Care at RHFM: David Dovnarsky, M.D.

Dr. Dovnarsky evaluated Plaintiff's depression, low back pain, anemia, gastroesophageal reflux disease "GERD," and asthma on May 13, 2013. (Tr. 406.) Plaintiff reported that Zoloft was helping her depression, and appeared to be in good spirits on examination—although she admitted to having three to four crying spells a week. (Tr. 404–05.) She also reported that her lower back pain had improved with Tramadol, but that the pain was still constant. (Tr. 404.) She exhibited tenderness along the knee joint, although she had full range of motion "without signs of ligamentous[11] or bony compromise." (Tr. 405.) On June 9, 2013, Plaintiff went to the emergency room after she injured her hip. (Tr. 438.) In a letter dated June 10, 2013, Dr. Dovnarsky stated that Plaintiff was unable to work due to back and neck pain, and the need to take care of her son. (Tr. 326.) Plaintiff followed up with Dr. Dovnarsky on June 11 and June 17, for hip and back pain. (Tr. 1759, 1788.) Plaintiff reported numbness in her anterior thigh and tenderness in her anterior hip, but an X-ray taken on June 9 showed no subluxation[12] or fracture in her left hip and pelvis. (Tr. 1759.) On July 15, 2013, five days after a dog bit Plaintiff's knee, she saw Dr. Dovnarsky. (Tr. 1849.) She exhibited decreased range of motion, swelling, and tenderness in her left knee, and Dr. Dovnarsky sent her to the emergency room for further evaluation. (Tr. 414–15.) On July 29, 2013, Plaintiff showed improvement in her hip and knee injuries, and noted that she had started receiving assistance from a home aide for her son since the dog bite. (Tr. 1884.)

---

[11] Ligamentous is defined as "relating to or of the form or structure of a ligament." *Ligamentous*, STEDMAN'S MEDICAL DICTIONARY 498570.

[12] Subluxation, also called slippage, is when the bones of a joint shift, but do not become totally dislocated. This can be a chronic problem. *Understanding Dislocation – the Basics*, WEBMD, http://www.webmd.com/a-to-z-guides/understanding-dislocation-basics (last visited July 25, 2017).

On December 2, 2013, Plaintiff saw Dr. Dovnarsky for an annual examination and reported her pain score to be zero.  (Tr. 1996–97.)  Dr. Dovnarsky directed Plaintiff to stop taking Zoloft and prescribed Cymbalta for depression.  However, after about a month, he switched her back to Zoloft after about one month due to nervousness and teeth grinding.  (Tr. 2003, 2066.)  He also referred Plaintiff to psychiatric counseling.  (Tr. 2003.)  Plaintiff returned to Dr. Dovnarksy on February 24, 2014 complaining of headache, eye pain, neck and back pain, and generalized body aches.  (Tr. 2088, 2093.)  Her mood was "stable," and Plaintiff reported having seen a pain management doctor but also noted that she did not want injections.  (Tr. 2094.)  Dr. Dovnarsky found no tenderness points in her back or legs—but noted that the pain seemed to be more diffuse—and prescribed Tramadol for her back and hip pain, as well as iliotibial band syndrome ("IT band syndrome").[13]  (*Id.*)  On March 4, 2014, Dr. Dovnarsky treated Plaintiff with albuterol for shortness of breath and wheezing resulting from an exacerbation of her chronic asthma condition.  (Tr. 2123–24.)  In a medical report dated December 23, 2014, Dr. Dovnarsky restated his diagnosis of chronic low back pain, depression, asthma, and migraine headache.  (Tr. 502–04.)

### 2.  OMT at RHFM with Philip Cruz, D.O. and Stephanie Ortiz, D.O.

Dr. Cruz, a sports medicine specialist, examined Plaintiff for back pain on May 21, 2013. (Tr. 1723.)  He noted that although the first trigger point injection had failed—the relief only lasted about three days—Plaintiff was still a likely candidate for trigger point injections.  (Tr. 1729–30.) On August 20, 2013, Plaintiff saw Dr. Cruz for hip and low back pain of 8/10 intensity, and was diagnosed with IT band syndrome.  (Tr. 1909, 1913–14.)  Examination of Plaintiff's left hip

---

[13] The iliotibial band is a tendon on the outside of a leg, which connects the pelvic bone to just below the knee. This syndrome occurs when the iliotibial band becomes swollen and irritated from rubbing against the knee bone. *Iliotibial Band Syndrome – Aftercare*, MEDLINEPLUS, https://medlineplus.gov/ency/patientinstructions/000683.htm (last visited July 11, 2017).

revealed no acute fracture or subluxation, and an X-ray of the left knee showed soft tissue injury but no osseous or articular abnormality.[14] (Tr. 1914–15.) On the same day, Dr. Cruz opined in a letter that Plaintiff was unable to return to work until further notice due to hip and back pain. (Tr. 417.) Plaintiff also underwent OMT with Dr. Ortiz, for low back pain on October 30, 2013, and November 20, 2013, and for neck and back pain on December 12, 2013, each time presenting with pain of 8/10 intensity. (Tr. 1938, 1969, 2035.) In her October 30 notes, Dr. Ortiz noted that Plaintiff exhibited tightness in her left Sacroiliac Joint, left psoas, left IT band, and had diffuse tender points. (Tr. 1944.) Plaintiff also had left knee crepitus[15] and tenderness upon palpation. (*Id.*) Dr. Cruz's December 12, 2013 notes indicate that Plaintiff's neck pain had worsened possibly due to having slept in the wrong position. (Tr. 2039.) On April 8, 2014, Dr. Cruz found decreased range of motion, tenderness and spasm in Plaintiff's back and administered steroid injection. (Tr. 2152, 2156.)

### 3. Visits at JHMC: Svetlana Gavrilova, M.D. and Vadim Goldshteyn, M.D.

On September 12, 2013, Dr. Svetlana Gavrilova, a physician specializing in physical medicine and rehabilitation, prescribed eight weeks of physical therapy based on the diagnosis of left hip pain, back pain, psoas syndrome, muscle spasm of back, and low back pain. (Tr. 716.) Shortly thereafter, Plaintiff received physical therapy at JHMC four times in October and

---

[14] Osseous abnormality refers to abnormality relating to bone, while articular abnormality refers to abnormality relating to a joint. *Osseus*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/osseous (last visited July 25, 2017); *Articular*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/osseous (last visited July 25, 2017).

[15] Crepitus is synonymous with crepitation, which refers to "noise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions." *Crepitation*, STEDMAN'S MEDICAL DICTIONARY 211900.

November of 2013.[16]  (Tr. 711–97.)  Her pain decreased from 8/10 to 5/10 intensity after physical therapy on one occasion, and from 6/10 to 2/10 on another.  (Tr. 741, 780.)

Dr. Vadim Goldshteyn, a physician specializing in physical medicine and rehabilitation, saw Plaintiff for moderate low back pain on November 11, 2013.  (Tr. 798–800.)  Dr. Goldshteyn diagnosed Plaintiff as having, *inter alia*, degenerative joint disease of the lumbar spine and low back pain.  (Tr. 800.)  Plaintiff reported "moderate" pain that had been ongoing, but also that her physical therapy yielded "good result[s]."  (*Id.*)  She did not report having neck pain that day.  (Tr. 802.)  Dr. Goldshteyn prescribed physical therapy, pain management consultation, and a Transcutaneous Electrical Nerve Stimulation ("TENS") unit.[17]  (*Id.*)  On February 10, 2014, he saw Plaintiff again for moderate to severe low back pain and noted Plaintiff's failure to complete the last course of physical therapy.  (Tr. 846.)  Upon the referral of Dr. Goldshteyn, Plaintiff resumed physical therapy for her low back pain secondary to degenerative disc disease and degenerative joint disease, and was seen five times in February and March 2014.[18]  (Tr. 865–92, 908–46, 972–89, 990–1007.)  Over the course of the treatment, Plaintiff presented with generally decreasing levels of pain, and reported that therapy provided some immediate relief.  (*Id.*)

4.  Emergency Care at JHMC

Plaintiff went to the emergency room at JHMC on two other occasions.  She was admitted for bronchitis on November 18, 2014.  (Tr. 505, 632.)  Dr. Ojas Desal, an internal medicine physician, observed coughing, chest tightness, shortness of breath, wheezing, and chest pain.  (Tr.

---

[16] These visits occurred on October 14, October 24, October 30, and November 8, 2013.

[17] A Transcutaneous Electrical Nerve Stimulation (TENS) unit helps prevent pain signals from reaching the brain by sending stimulating pulses across the skin and along the nerve strands. THE ORIGINAL TENS UNITS, https://www.tensunits.com/ (last visited July 11, 2017).

[18] These visits occurred on February 12, March 3, March 5, March 24, and March 27, 2014.

631.)  A chest X-ray showed no acute pathology.  (Tr. 638.)  Plaintiff was treated with albuterol and discharged the next day.  (Tr. 631–32.)  On January 8, 2015, Plaintiff returned after hitting her head from a slip and fall, and reported left knee pain, muscular pain on the left side of her neck, and dizziness.  (Tr. 511, 670.)  She was diagnosed with contusion on her left knee and laceration.  (Tr. 673.)  An examination by Dr. David Mallin, an internal medicine physician, found tenderness on the head and neck, and decreased range of motion and bony tenderness in the left knee.  (Tr. 672.)  Dr. Mallin ordered a head CT and left knee X-ray, both of which showed no significant abnormalities.  (Tr. 684–85.)

### B.  Psychological Medical History

With respect to Plaintiff's emotional and psychological health, she was mainly treated by Sumini Thomas, a licensed clinical social worker ("LCSW"), Roxana Korb, LCSW, Teresita Ruiz, M.D., a psychiatrist, and Pravina Nair, Psy.D., a clinical psychologist.

#### 1.  Sumini Thomas, LCSW

On January 25, 2014, Plaintiff saw social worker Sumini Thomas, at JHMC, for anxiety, worsening depression, and difficulty sleeping.  (Tr. 827–28.)  Thomas diagnosed Plaintiff with major depression, noting that Plaintiff was depressed due to her responsibilities taking care of her disabled child, but that she was motivated to get better.  (Tr. 832.)  Psychiatric evaluation and medication management were recommended.  (*Id.*)

#### 2.  Teresita Ruiz, M.D.

On February 25, 2014, Dr. Teresita Ruiz, a psychiatrist, admitted Plaintiff to the psychiatric clinic at RHMC based on a diagnosis of bipolar and depressive disorders.  (Tr. 525–26, 539.)  Upon examination, Dr. Ruiz assessed recurrent major depressive disorder.  (Tr. 901.)  Based on a mental status examination, Dr. Ruiz noted that Plaintiff exhibited a cooperative and anxious attitude, depressed mood, and that Plaintiff's orientation, memory, concentration, general knowledge,

14

insight, and judgment were "intact." (Tr. 900.) Plaintiff later agreed to a treatment plan of weekly individual psychotherapy and monthly medication management. (Tr. 539.) At their first medication management session on March 11, 2014, Dr. Ruiz found Plaintiff to be anxious, dysthymic,[19] restless and fidgety—although her cognition was grossly intact, and Plaintiff exhibited good insight and judgment. (Tr. 952.) Dr. Ruiz noted that Plaintiff had been taking Zoloft, which helped, but also that her asthma medications might have exacerbated anxiety and mood symptoms. (Tr. 953.) Although Plaintiff denied manic or psychotic symptoms, Dr. Ruiz diagnosed her with recurrent and severe major depressive disorder, specified with psychotic behavior. (Tr. 953, 955.) At her next visit on May 1, 2014, Plaintiff presented with anxious and dysthymic mood. (Tr. 1057.) She had stopped Zoloft without tapering off. (Tr. 1058.) Dr. Ruiz advised her to taper off before starting Cymbalta, which was given to manage her bodily pain. (*Id.*) Plaintiff missed her appointments with Dr. Ruiz on May 20, 2014 and January 8, 2015. (Tr. 559, 621.)

3.    Roxana Korb, LCSW

Shortly after Plaintiff was admitted to the psychiatric clinic, social worker Roxana Korb, at JHMC, conducted a thirty-day admission review. (Tr. 549.) Korb concluded that admission was appropriate given Plaintiff's age and diagnosis of recurrent major depressive disorder. (Tr. 550.) She also opined that Plaintiff had difficulty in "Occupational Functioning" and "Daily Activities/Social Skills." (*Id.*)

_____

[19] Dysthymic disorder refers to a "chronic disturbance of mood characterized by mild depression or loss of interest in usual activities." *Dysthymic Disorder*, STEDMAN'S MEDICAL DICTIONARY 259940.

4.        Pravina Nair, Psy.D.

Pursuant to Dr. Ruiz's treatment plan, Plaintiff started psychotherapy with Dr. Pravina Nair, a psychologist, on March 26, 2014. (Tr. 965.) Plaintiff presented with euthymic mood[20] and the session focused on building rapport and understanding the nature of her problems. (Tr. 966.) She returned four times in April 2014 and twice in May 2014.[21] (Tr. 1008–51, 1066–89.) On each occasion, Dr. Nair observed euthymic mood, and Plaintiff reported feeling increasingly overwhelmed by family stressors. (*Id.*) For example, on April 16, 2014, Plaintiff reported that she wanted to be more productive and reported having been feeling tearful for the past couple days due to unaccomplished responsibilities. (Tr. 1024.) On June 25, 2014, in a treatment plan review, Drs. Ruiz and Nair concluded that although Plaintiff's' overall mood and energy had improved, Plaintiff continued to feel overwhelmed and depressed when faced with psychosocial stressors, and that Plaintiff required continued treatment for major depression disorder. (Tr. 569–70.) Drs. Ruiz and Nair reached similar conclusions in the next two treatment plan reviews, dated September 25, 2014 and December 24, 2014, opining that Plaintiff was making progress, but that continued treatment was necessary. (Tr. 580, 609.) On December 4, 2014, Plaintiff missed her appointment, but she reported that she was doing well and could return the next week. (Tr. 599.)

---

[20] Euthymia refers to "moderation of mood, not manic or depressed." *Euthymia*, STEDMAN'S MEDICAL DICTIONARY 307600.

[21] These visits occurred on April 8, April 16, April 21, April 28, May 7, and May 19, 2014.

### C.    Consultative Examiners

#### 1.    Brian Wosnitzer, M.D.

Dr. Brian Wosnitzer, a nuclear medicine specialist, conducted an internal medical consultative physical examination of Plaintiff on September 13, 2013. (Tr. 454–60.) Plaintiff's chief complaints were lower back pain, asthma, migraine headaches, depression, GERD, psoas syndrome, anemia, and left hip pain. (Tr. 455.) She reported to getting approximately five headaches per month and that they caused nausea and vomiting. (Tr. 455, 459.) Dr. Wosnitzer observed that Plaintiff's gait was normal but slow, and that she had no problem getting on and off the exam table. (Tr. 457.) Plaintiff declined to walk on her heels and toes or squat due to back pain. (*Id.*) Dr. Wosnitzer noted that Plaintiff's cervical spine showed full flexion, extension, bilateral lateral flexion, and full bilateral rotary movement. (Tr. 458.) She had limited flexion, in her lumbar spine, due to lower back pain; otherwise, she had full extension, lateral flexion, and rotary movements. (*Id.*) Plaintiff reported lower back pain at 50 degrees with supine bilateral straight leg raise test. (*Id.*) She also had full range of motion of hips, knees, and ankles bilaterally, and her joints were stable, non-tender, and did not exhibit redness, heat, or swelling. (*Id.*)

Dr. Wosnitzer also conducted a mental status screen. (Tr. 458–59.) He noted that Plaintiff was dressed appropriately, maintained good eye contact, and appeared oriented in all spheres; there was no evidence of impaired judgment or significant memory impairment. (*Id.*) Plaintiff's affect was normal, according to Dr. Wosnitzer. (Tr. 459.) After performing a pulmonary function test, he found that Plaintiff had low vital capacity, possibly due to restriction of lung volume.[22] (Tr.

---

[22] Plaintiff's FEV1 was 71% of predicted value. (Tr. 462.) "FEV1" is a regular part of pulmonary function tests. It stands for forced expiratory volume in 1 second. The value is usually considered abnormal if it is less than 80% of the patient's predicted value. Therefore, in this case, Plaintiff's value of 71% would usually be considered abnormal. *Pulmonary Function Tests*, MEDLINEPLUS, https://medlineplus.gov/ency/article/003853.htm (last visited July 5, 2017). Forced vital capacity is the amount of air a patient exhales during a FEV test. *Forced Expiratory*

461–62.)  Dr. Wosnitzer opined that Plaintiff should avoid dust, allergens and heavy exertional activities.  (Tr. 459.)  He also opined that Plaintiff was moderately limited in prolonged walking, climbing, bending, and heavy lifting due to low back and left hip pain.  (*Id.*)  He found, Plaintiff to be only mildly limited in daily activities due to migraine headaches.

### 2.    Michael Kushner, Ph.D.

On the same day of her consultative examination with Dr. Wosnitzer, Plaintiff also received a consultative psychiatric evaluation by Dr. Michael Kushner, a psychologist.  (Tr. 448–53.)  Dr. Kushner diagnosed depressive disorder and anxiety disorder.  (Tr. 452.)  He observed that Plaintiff had a responsive and cooperative demeanor, and that her manner of relating, social skills, and overall presentation were "adequate."  (Tr. 450.)  At the evaluation, Plaintiff walked with a cane, was "mostly well groomed," and maintained appropriate eye contact.  (*Id.*)  Plaintiff had a somewhat agitated affect and exhibited neutral mood.  (*Id.*)  Dr. Kushner found Plaintiff to have impaired attention and concentration, somewhat impaired recent and remote memory skills, and an average level of intellectual functioning.  (Tr. 451.)

In his medical source statement, Dr. Kushner opined that Plaintiff was not limited in her capacity to follow and understand simple instructions, to perform simple tasks independently, and to make appropriate decisions.  (*Id.*)  However, she was moderately limited in maintaining attention and concentration, and she had mild to moderate limitations in maintaining a regular schedule, learning new tasks, and performing complex tasks under supervision.  (*Id.*)  Moreover, Plaintiff was moderately limited in her ability to relate with others and cope with stress.  (Tr. 451–52.)  Dr. Kushner concluded that these limitations were caused by and consistent with Plaintiff's

*Volume and Forced Vital Capacity*, WEBMD, http://www.webmd.com /lung/tc/forced-expiratory-volume-and-forced-vital-capacity-topic-overview  (last visited August 1, 2017).

psychiatric problems, but that they were not significant enough to interfere with Plaintiff's ability to function on a daily basis. (Tr. 452.)

### 3. P. Kennedy-Walsh, M.D. and A. Nwafor, SDM

On September 25, 2013, Plaintiff was evaluated by Dr. P. Kennedy-Walsh, a consultative psychiatrist, and also by A. Nwafor, a State agency disability analyst.[23] (Tr. 142–53.) Dr. Kennedy-Walsh assessed Plaintiff's mental limitations, and Nwafor assessed Plaintiff's physical capacity. (*See id.*) Based on the reports of Drs. Kushner and Wosnitzer and also based on portions of Plaintiff's medical records from JHMC, which did not include any opinion evidence, Dr. Kennedy-Walsh and Nwafor concluded that Plaintiff was restricted to sedentary work, but was not disabled.[24] (Tr. 144–45, 147–48, 152.) Dr. Kennedy-Walsh found that Plaintiff had severe medically determinable impairments, namely impairments in the categories of osteoarthrosis and allied disorders and affective disorders. (Tr. 142–46.) While Plaintiff's spine and affective disorders were severe, they did not meet or equal any Listings. (Tr. 146.) Dr. Kennedy-Walsh made the following mental residual functional capacity assessment: Plaintiff had limitations as to her capacity to understand and remember. (Tr. 149–50.) Specifically, Plaintiff had moderate limitations in her ability to remember locations and work-like procedures and to understand and remember detailed instructions. (*Id.*) Plaintiff also had moderate limitations in her ability to carry out very short and simple instructions; follow detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular

---

[23] The Court notes that P. Kennedy-Walsh is a psychiatrist, based on the specialty code of 37 notated next to her name. *See* https://secure.ssa.gov/poms.nsf/lnx/0424501004.

[24] This determination was made based on the following evidence: two consultative expert reports, two reports from JHMC received on July 19, 2013 and August 7, 2013, and a report identified as "ADL's." (Tr. 144–45.) Five additional requests for evidence, including one to Dr. Dovnarsky, were made; however, it is unclear if the evidence was ever received.

attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 150.) Moreover, Plaintiff was moderately limited in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (*Id.*)

The State agency disability analyst, Nwafor, SDM, found that Plaintiff had the physical RFC to occasionally lift ten pounds, stand or walk for two hours, and sit for six hours in an eight-hour day. (Tr. 148.) He also opined that Plaintiff was to avoid all exposures to environmental irritants, but had no limitations as to pushing and pulling. (Tr. 148–49.) Plaintiff's claims regarding symptoms were found to be only "partially credible" because she did not fully explain her symptoms, and the treatments did not corroborate her complaints. (Tr. 147.)

## V.     The Hearing

At the hearing, ALJ Hoppenfeld heard testimony from Plaintiff, who was represented by a non-attorney representative Nina Radiu from the New York City Human Resources Administration's Disability Services Program, and also from Dr. Chukwuemeka Efobi, a board certified psychiatrist and the psychological expert, and Andrew Pasternak, M.A., a vocational expert. (Tr. 31–32, 197–200.)

### A.     Plaintiff's Testimony

At the hearing, Plaintiff testified as follows: Plaintiff, a single mother, lives with three of her children, one of whom is disabled and has cerebral palsy, developmental delay, and a seizure disorder. (Tr. 43–44, 46.) She had completed school up to the tenth grade of high school. (Tr.

52.)  In 2000, she worked as a part-time census worker; in 2007, for about six months, she had a part-time position sorting mail.  (Tr. 54–55.)

Plaintiff had gone to a hospital on five occasions: on June 10, 2013, for a dog bite on her left knee and subsequent infection (Tr. 62–64); another time in 2014 for chest pain (Tr. 61–62); in May 2014 for hip pain (Tr. 83); on November of 2014, for coughing and wheezing (Tr. 59–61); and on January 8, 2015, the day before the hearing, for a fall with injury to her head and left knee (Tr. 56–58).  Plaintiff stated that it was hard to go anywhere because if she sat in a certain way she would "stay stuck," and if she stood up, her back would hurt.  (Tr. 75.)

She first sought psychiatric care in 2010 but she stopped going to her sessions because she was uncomfortable with her therapists being switched many times by the medical center.  (Tr. 67–70.)  In 2014, she started seeing Dr. Pravina Nair,[25] her psychologist, because she became depressed due to her back pain and inability to take care of her son the way she used to before being injured by the dog bite.  (Tr. 70–71.)  Thereafter, she saw Dr. Nair every week.  (Tr. 76.)  She was also seeing Dr. Teresita Ruiz, her psychiatrist, once a month.  (Tr. 76.)  Plaintiff testified to having difficulty falling asleep and concentrating, and poor memory.  (Tr. 73–75, 78.)

Plaintiff's mother, older son, and daughter shopped and cleaned the house, and the family mostly ordered take-out meals.  (Tr. 80–82.)  She had no friends, although she had gone to church for the first time the previous Sunday.  (Tr. 77.)  She had developed a tendency to become "uncomfortable fast," and avoided speaking to people on the phone—even her mother.  (Tr. 79.)  She spent most of her time in her room.  (*Id.*)  A home aide came to help take care of Plaintiff's son, but Plaintiff was not allowed to leave the child alone with the home aide.  (Tr. 79–80.)

---

[25] Plaintiff's testimony was slightly inaccurate with respect to Dr. Nair's first name and when she started seeing her.  While Plaintiff testified to starting her treatment with Dr. Nair in 2013, the record indicates that she commenced treatment with Dr. Nair in 2014.  (*See supra* p. 16.)

Plaintiff could walk one block without coughing and experiencing back pain. (Tr. 82.) She required a cane to prevent her from falling. (*Id.*) She generally avoided going outside alone because of the possibility of falling. (Tr. 83.) She could stand for ten to fifteen minutes (*id.*), but could not kneel due to her left knee pain (Tr. 87). Plaintiff helped her disabled son dress before school, picked up after him "whatever [she could] little by little," and tried to keep track of her appointments with the help of alarms on her phone. (Tr. 91.)

She would get headaches at least three to four times a month, which on two occasions caused her to throw up. (Tr. 93.) She had found Excedrin to be helpful for the headaches. (*Id.*) Her anemia, which made her cold and weak, was treated with vitamin B12 complex. (Tr. 94–95.) Her back pain and stiff neck were at the intensity level of 10/10 at the hearing. (Tr. 96–97.) Plaintiff had a TENS unit, which she normally wore at all times, but she did not bring it to the hearing because she was unsure as to whether it would be allowed in the courthouse. (Tr. 84–85.) Throughout the hearing, Plaintiff had to stand and stretch due to physical pain. (Tr. 65, 98, 119.)

### B. Testimony of State Agency Psychiatrist Expert, Chukwuemeka Efobi, M.D.

Dr. Chukwuemeka Efobi, a board certified psychiatrist, testified as an expert, solely based medical records from RHFM from October 20, 2011 to July 29, 2013 (Exhibit 2F) and reports by consultative physicians Dr. Kushner and Dr. Wosnitzer (Exhibit 5F). None of these records were from Plaintiff's treating psychiatrist or psychologist. (Tr. 99.) Dr. Efobi observed that Plaintiff was evaluated to have normal mood and affect according to eight visit records. (Tr. 101–03.) Disagreeing with Dr. Kushner, the consultative psychologist who diagnosed Plaintiff with depressive disorder and anxiety disorder, Dr. Efobi opined that Plaintiff had an adjustment disorder with mixed emotion. (Tr. 104.) Dr. Efobi concluded that Plaintiff's mental impairment was not severe. (*Id.*) He noted that Plaintiff exhibited no decompensations. (Tr. 105.) With respect to Plaintiff's mental capacities, Dr. Efobi opined that Plaintiff had moderate limitation only as to the

social aspect, which was caused by self-isolation. (Tr. 105–06.) He opined that the limitations associated with other aspects, such as concentration and activities of daily living were mild. (Tr. 104, 106–07.) On cross-examination, Plaintiff's representative asked Dr. Efobi whether he had considered Dr. Kushner's September 13, 2013 opinion of *moderate*, as opposed to mild, limitation in concentration in Exhibit 5F before concluding that Plaintiff had minimal limitation as to concentration. (Tr. 108–09.) Based on the transcript, it is not entirely clear what Dr. Efobi's response was. While Dr. Efobi responded that he "did note" and "saw" Dr. Kushner's opinion, the rest of the testimony was not recorded as it was inaudible. (Tr. 109.) When the representative attempted to ask, what appears to be, a follow-up question, the ALJ interjected by saying, "Okay. That's argumentative, he [Dr. Efobi] considered it, but he didn't feel it was supported at the time." (*Id.*) Then, the ALJ stated that Dr. Efobi's opinion had much greater weight than Dr. Kushner's opinion because Dr. Efobi is a Board Certified psychiatrist, while Dr. Kushner is a psychologist. (Tr. 109–10.) The ALJ also asked Dr. Efobi about Plaintiff's ability to follow more than one or two directions, to which Dr. Efobi began to answer, "[Plaintiff] should be able to . . . ," but was unable to give a complete answer because the ALJ interjected and answered her own question by saying, "Yes? Okay. All right." (Tr. 107.)

The ALJ also noted that Dr. Efobi's testimony "is going to be subject [to revision], because [they had] to get [additional] records from [Plaintiff's] current treating psychiatrist," which was not part of the record at the time of the hearing. (Tr. 107.) However, Dr. Efobi's opinion did not change even after he had the opportunity to review the additional medical records Plaintiff submitted after the hearing, which included the records of Plaintiff's treating psychiatrist and psychologist. (Tr. 22.)

## C.     Testimony of Vocational Expert, Andrew Pasternak

Vocational expert ("VE") Andrew Pasternak testified at Plaintiff's hearing.  Classifying Plaintiff's previous work as a survey worker and mail clerk, the VE noted that the jobs were light and unskilled with a specific vocational preparation ("SVP") of 2.[26]  (Tr. 116–17.)  The ALJ first asked the VE to assume an individual of Plaintiff's age, forty-four, and her education, who could perform a full range of light work.  (Tr. 117.)  The VE testified that such an individual could perform both of Plaintiff's previous jobs.  Next, the ALJ asked the VE to consider a second hypothetical person with the same limitations, but with the added limitation that the person could perform only sedentary work.  (Tr. 117–18.)  The VE testified that such a person would not be able to perform Plaintiff's previous jobs.  (Tr. 118.)  The ALJ then asked the VE to consider a third hypothetical person with the same limitations as the second hypothetical, but who also required limited to minimal contact with co-workers.  (*Id.*)  The VE responded that such a person would be capable of working as a lense inserter, document preparer, and film inspector.  (Tr. 118–19.)  Then, the ALJ asked the VE, for the fourth hypothetical, to assume the same limitations as the third hypothetical, but to add the limitation that the job had to be simple, routine, repetitive, and low-stress with minimal decision-making involved.  (Tr. 119–20.)  The VE testified that Plaintiff could perform the previously identified jobs.  (Tr. 120.)  Finally, the VE testified that if the exertional level was light, rather than sedentary, then such an individual could perform the jobs of assembler of hospital products, garment sorter, and inspector.  (Tr. 120–22.)  Taking into consideration Plaintiff's asthma, the VE noted that all of the jobs he mentioned would be free of respiratory

---

[26] Specific Vocational Preparation "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  *O'Dell v. Colvin*, No. 16-CV-368 (AJP), 2016 WL 6882861, at *10 n.17 (S.D.N.Y. Nov. 22, 2016) (quoting U.S. Dep't of Labor, *Dictionary of Occupational Titles* Appendix C (4th ed. 1991)).

irritants. (Tr. 121–28.) The VE also testified that a person with moderate limitations with respect to prolonged walking, climbing, and bending, and heavy lifting due to back and hip pain could still perform all of the jobs identified. (Tr. 129–30.) Furthermore, the VE testified that Plaintiff could "absolutely" perform all of the jobs he had mentioned even assuming that Plaintiff had the mental limitations determined by Dr. Kushner, *i.e.*, moderate limitations in terms of maintaining attention and concentration, maintaining a regular schedule, learning new tasks, and performing complex tasks under supervision. (Tr. 130–31.) However, Plaintiff would not be able to hold any of these jobs if she had to be absent once a week, or four times a month. (Tr. 132.)

### D.     Supplementation of the Record

The ALJ held the record open, admitted additional evidence relating to Plaintiff's medical care, provided that evidence to Dr. Efobi, the medical expert, and gave Plaintiff an opportunity to request a supplemental hearing and cross-examine Dr. Efobi again. (Tr. 59, 323–24, 1092.) According to the record, Plaintiff did not seek a supplemental hearing.

## VI.     The ALJ's Decision

On September 17, 2015, the ALJ issued a decision denying Plaintiff's application based on the five-step analysis required by 20 C.F.R. § 416.920(a). (Tr. 10–26.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 8, 2013. (Tr. 12.) At step two, the ALJ found that Plaintiff suffered from the following impairments that, in combination, are severe: degenerative disease of the lumbar spine, asthma/allergies, and adjustment disorder. (*Id.*) However, the ALJ found that Plaintiff's conditions of anemia, migraine, left hip pain, and left knee pain were not severe. (Tr. 12–13.) At step three, the ALJ found that none of the above impairments, on their own or in combination, met or medically equaled any of the Listings. (Tr. 13–14.)

The ALJ found that Plaintiff has the RFC to perform light work,[27] but is limited to simple, routine, and minimal decision-making jobs, known as low-stress work, and jobs involving minimal interaction with coworkers given her adjustment disorder. The ALJ also found that Plaintiff should be limited to work areas free of respiratory irritants given her asthma. (Tr. 14.) Overall, the ALJ found that Plaintiff's medically determinable impairments could not reasonably be expected to cause the alleged symptoms and that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not supported by the medical record. (Tr. 22.) In determining Plaintiff's RFC, the ALJ held that Plaintiff's complaint about her physical impairments, including back pain, left knee and left hip pain, and migraines, was not supported by objective evidence. (Tr. 19–20.) As for mental impairments, the ALJ found that the result of Plaintiff's mental impairments was merely that she was limited to simple, routine, and minimal decision-making jobs that involve minimal interaction with coworkers. In reaching this conclusion, the ALJ gave significant weight to Dr. Efobi's testimony, in which he opined that the records indicate Plaintiff's consistent improvement over the course of 2014 and Plaintiff's good spirits. (Tr. 21–22.) The ALJ did not give controlling weight and gave only "some" weight to the opinion of Dr. Kushner, Plaintiff's consultative psychologist, noting that it was "not known what, if any, medical evidence was offered to him for his perusal and it appear[ed] some of his findings were based upon [Plaintiff's] subjective complaints." (Tr. 22, 24.) With the exception of Dr. Wosnitzer's assessment of limitation due to asthma, the ALJ gave limited weight to the opinions of: (1) Plaintiff's treating physician, Dr. Cruz, who opined that Plaintiff was unable to work due to hip and back pain; (2) the consultative physician, Dr. Wosnitzer, who opined that Plaintiff had

---

[27] Specifically, she found that Plaintiff was capable of standing, sitting, and/or walking for six hours in an eight hour day and occasionally lifting twenty pounds. (Tr. 14.)

moderate limitation in prolonged walking, climbing, bending, and heavy lifting, and mild limitation in daily activities from migraines five times a month; and (3) Dr. Navarro, who opined that Plaintiff was limited in multiple exertional, postural, cognitive, and environmental areas. (Tr. 23–24.) There was no mention of how much weight, if any, was given to the medical opinions of Plaintiff's treating sources, Dr. Ruiz and Nair, or the consultative psychiatrist, Dr. Kennedy-Walsh. Additionally, in rejecting Plaintiff's claims as to her symptoms, the ALJ noted Plaintiff's poor work history prior to her medical conditions, and her reported activities, such as dancing and initiating a lawsuit. (Tr. 22.)

Having determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. 416.967(b), but was limited to low-stress work involving minimal interaction with coworkers and free of respiratory irritants (Tr. 14), the ALJ concluded, at step four, that Plaintiff was unable to meet the exertional demands of her past relevant work as a survey worker and a mail clerk. (Tr. 24.) At step five, relying on the VE's testimony, the ALJ concluded that there was a significant number of existing jobs in the national economy that Plaintiff could perform, such as an assembly worker (lense inserter), document preparer, assembler of hospital products, garment sorter, or inspector. (Tr. 24–25.)

## DISCUSSION

## I.      Standard of Review

### A.      Judicial Review

Unsuccessful claimants for disability benefits under the Social Security Act (the "Act") may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g); *accord* 42 U.S.C. § 1383(c)(3). In reviewing a final decision of the Commissioner, the Court's duty "is

limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009)). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (alterations and internal quotation marks omitted)). In determining whether the Commissioner's findings were based on substantial evidence, the Court must ascertain that the agency considered all evidence in reaching its findings. 20 C.F.R. § 404.1520(3). Moreover, the Court "is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (internal citation omitted). However, "it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). In any case, if there is substantial evidence in the record to support the Commissioner's findings as to any fact, they are conclusive and must be upheld. 42 U.S.C. § 405(g); *see also Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013).

In addition to its authority to affirm, modify, or reverse a final decision, the Court may remand the case for the ALJ to further develop the record, resolve conflicts and ambiguities, or elucidate his or her rationale. 42 U.S.C. § 405(g); *see also Grace v. Astrue*, No. 11-CV-9162 (ALC), 2013 WL 4010271, at *14 (S.D.N.Y. July 1, 2013) (adopting report and recommendation); *Cutler v. Weinberger*, 516 F.2d 1282, 1285 (2d Cir. 1975) (suggesting that courts tend to remand when relevant evidence "was not explicitly weighed and considered by [the agency], although such consideration was necessary to a just determination of a claimant's application" (internal citations omitted)).

**B.     Eligibility Standard for Social Security Disability Benefits**

Claimants must be disabled within the meaning of the Act to receive benefits.  Disability is established by an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . .  which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3). Such disability must result "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).  The claimant must prove that the impairment is "of such severity that [the claimant] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Under the Act's regulations, the ALJ must follow a five-step process to determine if a claimant is disabled.  The inquiry ends if at any step the ALJ determines that the claimant is either disabled or not disabled.  The claimant bears the burden of proof in the first four steps in the inquiry; the Commissioner bears the burden in the final step.  *Talavera*, 697 F.3d  at 151.  First, if the ALJ finds that the claimant is currently engaged in "substantial gainful activity," the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(i).

If the claimant is not so engaged, at step two, the ALJ determines whether the claimant suffers from a medical impairment, or a combination of impairments, that is "severe" in that it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§  404.1520(a)(4)(ii), 404.1520(c).  Such activities include physical functions such as walking and sitting, capacities of seeing and hearing, mental abilities such as understanding instructions, as well as social interactions in the work setting.  *See* 20 C.F.R. § 416.922(b).  To prove severity of the impairment, the claimant must present evidence from "acceptable medical

sources that reflect judgments about the nature and severity of your impairment(s) . . ." 20 C.F.R. § 416.927(a)(1); *see also* 20 C.F.R. § 416.913(a). The ALJ Commission is required to "consider the combined effect of all of [the claimant's] impairments," *Burgin v. Astrue*, 348 F. App'x. 646, 647 (2d Cir. 2009) (internal quotations omitted), but not the claimant's age, education, and work experience. 20 C.F.R. §§ 416.920(a)(4), 416.920(c). If the impairment is not severe, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(c).

If the impairment is severe and meets the Act's twelve-month duration requirement, the ALJ proceeds to step three, which considers whether the impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *see also* 20 C.F.R. pt. 404, Subpart P, App. 1. If the ALJ finds a listed impairment or an equivalent, the claimant is *per se* disabled. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant does not have a listed impairment, the ALJ then determines the claimant's "residual functional capacity" ("RFC"), which is "the most [a claimant] can still do despite [his or her medical] limitations." 20 C.F.R. § 404.1545(a)(1). The ALJ must consider all medically determinable impairments, "and any related symptoms . . . [which] may cause physical and mental limitations that affect what [the claimant] can do in a work setting"—"severe" or not—in finding the RFC. *Id.* Then, in step four, the ALJ is to use the RFC determination to determine if the claimant has the RFC to perform "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(e). If the claimant has the RFC sufficient to perform past work, he or she is not disabled. 20 C.F.R. §§ 404.1520(f), 404.1560(b). Otherwise, the ALJ proceeds to step five, where the burden shifts to the ALJ to demonstrate that the claimant has the capacity to perform other substantial gainful work available in the national economy, given the claimant's RFC, age,

education, and work experience.  20 C.F.R. § 404.1520(a)(4)(v).  If not, the claimant is disabled and entitled to benefits.  (*Id.*)

## II.  Analysis

Plaintiff contends that the ALJ erred by:  (1) failing to consider all of Plaintiff's severe impairments at step two of her analysis; (2) incorrectly concluding that Plaintiff's left knee and hip pain were unsubstantiated by objective findings; (3) failing to addressing Plaintiff's neck pain; (4) concluding that Plaintiff had adjustment disorder, rather than major depressive disorder; and (5) failing to evaluate Plaintiff's complaints of chronic pain.  Plaintiff also contends that the ALJ's RFC determination was not supported by substantial evidence and that the ALJ failed to adequately develop the record.  Each of these arguments is addressed, in turn, below.

### A.  Severity Determination

At Step Two, the ALJ must determine whether the claimant has an impairment, or a combination of impairments, that is severe, *i.e.*, imposes more than *de minimis* limitations on the ability to perform any basic work activities, and meets the durational requirement.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); 20 C.F.R. §§ 404.1521, 416.921.  The Second Circuit has held that this step is limited to screening out *de minimis* claims.  *Parker-Grose v. Astrue*, 462 F. App'x 16, 17 (2d Cir. 2012) (summary order) (citing *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995)).  However, the "'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, by itself, sufficient to render a condition 'severe.'"  *Calixte v. Colvin*, No. 14-CV-5654 (MKB), 2016 WL 1306533, at *22 (E.D.N.Y. Mar. 31, 2016) (quoting *Coleman v. Shalala*, 895 F. Supp. 50, 53 (S.D.N.Y. 1995)).

"Where an ALJ excludes certain impairments from the list of severe impairments at the second step, any such error is harmless where the ALJ identifies other severe impairments such that the analysis proceeds and the ALJ considers the effects of the omitted impairments during

subsequent steps." *Id.* at *23 (collecting cases and finding harmless error where the ALJ did not mention PTSD at the second step, instead finding Plaintiff's major depressive disorder, *inter alia*, to be severe and considering PTSD diagnosis in subsequent steps); *see also O'Connell v. Colvin*, 558 F. App'x 63, 65 (2d Cir. 2014) (holding that any error due to ALJ's exclusion of claimant's knee injury as a severe impairment was harmless because ALJ identified other severe impairments and considered the knee injury in subsequent steps). Nevertheless, where an ALJ's exclusion of an impairment from the list of severe impairments is not supported by substantial evidence, and the ALJ fails to account for functional limitations associated with the excluded impairment in determining the claimant's RFC, remand for further administrative proceeding is appropriate. *See Parker-Grose*, 462 F. App'x at 17 ("[The claimant's] case must be remanded for further administrative proceedings, because the ALJ's finding that [the claimant's] 'medically determinable mental impairment of depression is nonsevere,' is not supported by substantial evidence and the Commissioner failed to account for any functional limitations associated with [the claimant's] depression when determining her residual functional capacity . . . .").

Here, the ALJ found that although Plaintiff's various physical and mental impairments, considered individually, were not severe, there was a severe combination of degenerative disease of the lumbar spine, asthma/allergies, and adjustment disorder. (Tr. 12.) At the same time, the ALJ determined that Plaintiff's anemia, migraines, left hip pain, and left knee pain, either individually or in combination with other impairments, were not severe. (*Id.*) Plaintiff contends that the ALJ failed to consider the full medical record and committed error in concluding that Plaintiff's neck, left knee, and hip pain, and major depressive disorder were not severe. (Dkt. 16–1 at 25–26.) The Commissioner asserts that, because the ALJ identified other severe impairments

at step two and proceeded with the sequential evaluation, any error in the ALJ's analysis in the second step was harmless.

For the reasons discussed below, the Court finds that the ALJ's conclusion at step two that Plaintiff's left hip and left knee pain did not meet the requisite *de minimis* level of severity, even if erroneous, was harmless. However, the ALJ's failure to address Plaintiff's neck pain at step two was not harmless error, and warrants remand. In addition, although the ALJ addressed Plaintiff's non-exertional, mental impairments in determining her RFC, the ALJ's finding that Plaintiff had adjustment disorder—rather than major depressive disorder—is also ground for remand because, as discussed below, the mental RFC determination was not supported by substantial evidence.

### 1.  Plaintiff's Neck Pain

In response to Plaintiff's contention that the ALJ failed to address Plaintiff's neck pain, the Commissioner argues that the ALJ did not commit an error at step two because Plaintiff only alleged depression, back injuries, asthma, and allergies on her SSI application. (Dkt. 23 at 29.) However, in cases where courts found it significant that a claimant had failed to allege certain impairments in his or her application for disability benefits, there was ample evidence in the record indicating that the claimant did not suffer from the impairment that the claimant failed to mention in the application. *See Santos v. Astrue*, 12-CV-2075 (JGK), 2013 WL 5462337, at *5 (S.D.N.Y. Sept. 30, 2013) (collecting cases). Furthermore, the ALJ is required to consider impairments a claimant alleges *or* those "about which [the ALJ] receive[s] evidence." 20 C.F.R § 404.1512(a)(1). Therefore, Plaintiff's failure to allege neck pain on her application does not necessarily relieve the ALJ from her duty to take the entire record into consideration. *See Santos*, 2013 WL 5462337, at *5; *Rockwood v. Astrue*, 614 F. Supp. 2d 252, 275 (N.D.N.Y. 2009) (adopting report and recommendation that rejected Commissioner's argument that the ALJ's failure to give significant consideration to claimant's obesity was reasonable because claimant did not allege difficulty due

to obesity, where the claimant submitted medical evidence indicating that claimant was diagnosed with obesity).

The ALJ did not acknowledge or discuss Plaintiff's neck pain anywhere in her decision. However, the record includes Dr. Dovnarsky's notes regarding Plaintiff's neck swelling in February 2012. (Tr. 1148.) Moreover, in two separate letters dated June 4, 2012, and June 10, 2013, Dr. Dovnarksy opined that Plaintiff was unable to work due to, *inter alia*, chronic neck pain. (Tr. 441, 418.) Lachhman, the SSA interviewer, noted, in July 2013, that Plaintiff did not move her head or neck much. (Tr. 231.) Dr. Ortiz also diagnosed Plaintiff to have neck pain secondary to muscle spasms in December 2013. (Tr. 2040.) Such medical records suggest that neck pain was an ongoing condition that potentially limited Plaintiff's ability to function or work, and the ALJ plainly erred by failing to address the condition at step two or any subsequent steps. *See Booker v. Astrue*, No. 07-CV-646 (GLS), 2011 WL 3735808, at *5 (N.D.N.Y. Aug. 24, 2011) (holding that remand is appropriate because meaningful review was defeated by a lack of specific finding with respect to one of the claims at step two or any later steps); *Parker-Grose*, 462 F. App'x at 18 (finding ALJ's step-two error, *i.e.*, concluding that claimant's mental impairment was mild, was not harmless, where ALJ failed to take these restrictions into account when determining claimant's RFC). Because the ALJ did not address Plaintiff's neck pain in any subsequent step, the ALJ's failure to address the medical record pertaining to Plaintiff's neck pain at step two was not harmless.

2.     Left Knee and Hip Pain

In concluding that Plaintiff's left knee and hip pain did not meet the *de minimis* requirement for severity at step two, the ALJ provided only a conclusory explanation that "the medical evidence in [the] record [ ] did not establish [that the left knee and hip pain] caused more than minimal limitation in the claimant's ability to perform basic work activities." (Tr. 12.) For example, in

discussing step two of the analysis, the opinion does not mention Dr. Dovnarsky's May 13, 2013 notes, which indicated that Plaintiff had tenderness along the knee joint (Tr. 405), the doctor's June 11, 2013 notes, which indicated that Plaintiff had numbness in her thigh and hip (Tr. 1759), or his July 15, 2013 notes, which indicated that Plaintiff had decreased range of motion, swelling, and tenderness in her legs after the dog bite (Tr. 414–15). Nor did the ALJ acknowledge the 2013 letter of Plaintiff's sports medicine specialist, Dr. Cruz, stating that Plaintiff was unable to work due to *hip* and back pain. (Tr. 417.) Furthermore, the medical record indicates that Plaintiff had right hip swelling on August 20, 2013 (Tr. 1914), and Dr. Cruz noted Plaintiff's left knee crepitus and tenderness upon palpation (Tr. 1944).

However, in determining Plaintiff's RFC, the ALJ did consider this information regarding Plaintiff's knee and hip pain. The ALJ noted Plaintiff's August 2013 X-ray of the knee, the September 2013 internal medicine consultative examination, and October 2013 visit notes indicating that Plaintiff had left knee crepitus but was otherwise normal. (Tr. 19.) In addressing Plaintiff's RFC, the ALJ thoroughly discussed the medical record pertaining to Plaintiff's left knee and hip pain, and explained that she had minimal limitation in range of motion in the knee and there was no significant objective findings and only conservative treatment for her left hip pain. (*See* Tr. 19–20, 23.) Therefore, even assuming that the ALJ erred at step two by concluding that Plaintiff's left knee and hip pain were not severe, such error was harmless. *See Calixte*, 2016 WL 1306533, at *23.

### 3. Major Depressive Disorder

The evaluation of mental impairments follows a "special technique" pursuant to 20 C.F.R. § 404.1520a. *See Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) ("Th[e] regulations require application of a 'special technique' at the second and third steps of the five-step framework [ ] and at each level of administrative review." (internal citations omitted)). This technique requires "the

reviewing authority to determine first whether [a] claimant has a medically determinable mental impairment, [and if] there is such impairment, the reviewing authority must rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph C of the regulations, which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation." *Hernandez v. Astrue*, 814 F. Supp. 2d 168, 180–81 (E.D.N.Y. 2011) (internal quotation marks and citations omitted); *see* 20 C.F.R. §§ 404.1520a(b), (c); 20 C.F.R. §§ 416.920a(b), (c). [28]

Plaintiff asserts that the ALJ committed reversible error by failing to consider Plaintiff's diagnosis of major depressive disorder as a severe impairment and by concluding instead that Plaintiff had adjustment disorder, based on the non-examining medical expert's diagnosis of Plaintiff, thus violating the treating physician rule. (Dkt. 16-1 at 25.) The Court agrees, and finds that the ALJ's conclusion that Plaintiff had adjustment disorder was not supported by substantial evidence and was also an incorrect application of the treating physician rule.

---

[28] "[I]f the degree of limitation in each of the first three areas is rated 'mild' or better, and no episodes of decompensation are identified . . . [,] the reviewing authority generally . . . will conclude that the claimant's mental impairment is not severe and will deny benefits." *Kohler*, 546 F.3d at 266. "The ALJ must 'rate' the functional degree of limitation in each of these four areas as '[n]one, mild, moderate, marked [or] extreme.'" *Marthens v. Colvin*, No. 15-CV-535 (CFH), 2016 WL 5369478, at *3 (N.D.N.Y. Sept. 22, 2016) (citing 20 C.F.R. §§ 404.1520a(c)(4); 20 C.F.R. §§ 416.920a(c)(4)). If the ALJ determines that the claimant's mental impairment or combination of impairments is severe, the ALJ "will first compare the relevant medical findings [along with] the functional limitation rating to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. If so, the claimant will be found disabled." *Kohler*, 546 F.3d at 266 (citing 20 C.F.R. § 404.1520a(d)(1); 20 C.F.R. § 404.1520a(d)(2)). If not, the reviewing authority will then assess the claimant's RFC. *Id.* (citing 20 C.F.R. § 404.1520a(d)(3)). The application of this technique shall be documented in the decision "at the initial and reconsideration levels of administrative review." *Id.* (citing 20 C.F.R. § 404.1520a(e)(1)).

"Regardless of its source," Social Security regulations ("SSR") require that "every medical opinion" in the administrative record be evaluated when determining whether a claimant is disabled under the Act. 20 C.F.R. §§ 416.927(c), 404.1527(c). Acceptable medical sources that can provide evidence to establish an impairment include, *inter alia*, Plaintiff's licensed treating physicians and psychologists, as well as other medical professionals, and social welfare agency personnel and licensed specialists. *See* 20 C.F.R. §§ 416.902, 416.913(a), 404.1513(a).

The treating physician rule "generally requires deference to the medical opinion of a claimant's treating physician . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The opinion from a treating physician will be given "controlling" weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 127–28 (2d Cir. 2008) (referring to this as the "treating physician rule"). "Treating source" is defined as the "claimant's 'own physician, psychologist, or other acceptable medical source who provides a claimant with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with the claimant.'" *Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011) (quoting *Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009)). Medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, [a]s an essential diagnostic tool." *Green–Younger v. Barnhart*, 335 F.3d 99, 107 (2d Cir. 2003) (citation omitted).

"An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion." *Halloran*, 362 F.3d at 32 (citing 20 C.F.R. § 404.1527(d)(2), now codified at 20 C.F.R. § 404.1527(c)(2)). If the ALJ did not afford "controlling weight" to opinions from treating

physicians, the ALJ's decision should be guided by the following factors: "(1) the length, frequency, nature, and extent of the treating relationship; (2) the supportability of the treating source opinion; (3) the consistency of the opinion with the rest of the record; (4) the specialization of the treating physician; and (5) any other relevant factors." *Scott v. Astrue*, No. 09-CV-3999 (KAM)(RLM), 2010 WL 2736879, at *9 (E.D.N.Y. July 9, 2010); *Halloran*, 362 F.3d at 32; *see also* 20 C.F.R. § 416.927(c)(2)–(6). Although "[t]he ALJ is not required to explicitly discuss the factors," "it must be clear from the decision that the proper analysis was undertaken." *Elliott v. Colvin*, 13-CV-2673 (MKB), 2014 WL 4793452, at *15 (E.D.N.Y. Sept. 24, 2014). "The [ALJ] must [ ] give 'good reasons' for the weight given to the treating source's opinion." *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011). "The failure to provide 'good reasons' for not crediting a treating source's opinion is ground for remand." *See Burgin*, 348 F. App'x at 648 (quoting *Halloran*, 362 F.3d at 33).

It bears emphasis that "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." *Correale–Englehart v. Astrue*, 687 F. Supp. 2d 396, 427 (S.D.N.Y. 2010) (citing *Burgess*, 537 F.3d at 128) (adopting report and recommendation); *see also Anderson v. Astrue*, 07-CV-4969 (DLI), 2009 WL 2824584, at *9 (E.D.N.Y. Aug. 28, 2009) (noting that the opinion of a consultative physician, "who only examined plaintiff once, should not be accorded the same weight as the opinion of plaintiff's treating [physician]" (citing *Spielberg v. Barnhart*, 367 F. Supp. 2d 276, 282–83 (E.D.N.Y. 2005)). In addition, opinions of consulting physicians—whether examining or non-examining—are entitled to relatively little weight where there is strong evidence of disability on the record, or in cases in which the consultant did not have a complete record. *Correale–Englehart*, 687 F. Supp. 2d at 427.

Here, remand is warranted because the ALJ violated the treating physician rule by failing to consider the diagnoses by Dr. Ruiz and Dr. Nair, Plaintiff's treating psychiatrist and treating psychologist, respectively. Specifically, the ALJ inappropriately concluded—relying on the opinion of the State agency medical expert, Dr. Efobi—that Plaintiff had adjustment disorder, rather than major depressive disorder, as diagnosed by Drs. Ruiz and Nair. (Tr. 12–14.)

According to the record, Dr. Ruiz treated Plaintiff for major depressive disorder between February and May 2014. (Tr. 893–901, 947–55, 1052– 60.) Dr. Ruiz met with Plaintiff for a total of three appointments and conducted a mental status exam, diagnosed Plaintiff with major depressive disorder (recurrent), recommended a treatment plan, performed medication management reviews of Plaintiff's psychotropic medications, and recommended weekly psychotherapy. (Tr. 900, 901, 1058.) In addition, throughout 2014, Plaintiff regularly met with Dr. Nair for numerous psychotherapy sessions. (*See, e.g.*, Tr. 966, 1013, 1024, 580, 599.) Therefore, both Drs. Ruiz and Nair were treating physicians. *See Brickhouse v. Astrue*, 331 F. App'x 875, 877 (2d Cir. 2009) (citing 20 C.F.R. § 404.1502)). Both Dr. Ruiz and Dr. Nair diagnosed Plaintiff with major depressive disorder. (Tr. 901, 966.) Nevertheless, the ALJ concluded, based on the "significant weight" she accorded the opinion of non-examining medical expert Dr. Efobi, that Plaintiff suffers from adjustment disorder. (Tr. 23.) Moreover, the ALJ failed to expressly state what weight, if any, she gave to Dr. Ruiz and Nair's diagnosis of Plaintiff. By failing to assign any weight to Plaintiff's treating psychiatrist and psychologist, and by implicitly rejecting their diagnoses without providing any reasons for doing so, the ALJ committed error that requires remand. *See Halloran*, 362 F.3d at 32-33; *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("Failure to provide explicit 'good reasons' for not crediting [a treating source's] opinion of a claimant's treating physician is a ground for remand."); *Hidalgo v. Bowen*, 822 F.2d

294, 298 (2d Cir. 1987) (holding that the testimony of a nonexamining medical advisor "does not constitute evidence sufficient to override the treating physician's diagnosis"); *Melendez v. Astrue*, No. 08-CV-6374 (LBS), 2010 WL 199266, at *3 (S.D.N.Y. Jan. 20, 2010) (finding that the ALJ erred by failing to explain the limited weight given to plaintiff's treating physician where the ALJ adopted medical expert's diagnosis of plaintiff, over diagnosis given by plaintiff's treating physician).

In addition, the ALJ inappropriately gave "great weight" to Dr. Efobi's opinion. "Not having examined [Plaintiff], [a non-examining medical expert's] opinion cannot constitute substantial evidence and normally may not override a treating source's opinion unless it is supported by sufficient medical evidence in the record." *Maldonado v. Comm'r of Soc. Sec.*, No. 12-CV-5297 (JO), 2014 WL 537564, at *14 (E.D.N.Y. Feb. 10, 2014); *see also Burgess*, 537 F.3d at 130–32 (remanding where ALJ failed to give good reasons for adopting non-examining expert's findings over those of treating physician); *Roman v. Astrue*, No. 10-CV-3085 (SLT), 2012 WL 4566128, at *18 (E.D.N.Y. Sept. 28, 2012) ("Because mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health." (quoting *Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010))). "[T]he opinion of a non-examining consultant may constitute substantial evidence in support of the ALJ's determination where . . . other evidence in the record supports it." *Coburn v. Astrue*, No. 07-CV-0029 (VEB), 2009 WL 4034810, at *6 (N.D.N.Y. Nov. 19, 2009) (citing *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995)). Here, however, there is no medical evidence in the record to support Dr. Efobi's opinion, let alone allow Dr. Efobi's opinion to override that of Plaintiff's treating psychiatrist and psychologist. Thus, the ALJ committed

error by adopting the unsupported opinion of Dr. Efobi, over that of Plaintiff's two treating sources, and finding that Plaintiff suffers from adjustment disorder, rather than major depressive disorder.

### B.      RFC Determination

Between steps three and four, the ALJ determines the claimant's residual functional capacity, *i.e.*, the claimant's ability to perform physical and mental work activities on a sustained basis notwithstanding limitations imposed by her impairments.  20 C.F.R. §§ 416.920(e), 416.945. In determining the claimant's RFC, "the ALJ must consider all the relevant evidence, including medical opinions and facts, physical and mental abilities, non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 312 (W.D.N.Y. 2013) (alteration in original) (quoting *Stanton v. Astrue*, No. 07-CV-0803 (LEK)(VEB), 2009 WL 1940539, at *9 (N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(b–e) (adopting report and recommendation)).  Physical RFC is assessed in terms of the claimant's "ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching) . . . ."  20 C.F.R. §§ 404.1545(b), 416.945(b).  Mental RFC is assessed in terms of the claimant's "ability to carry out certain mental activities, such as . . . understanding, remembering, and carrying out instructions, and [ ] responding appropriately to supervision, co-workers, and work pressures in a work setting. . . ."  20 C.F.R. §§ 404.1545(c); 416.945(c); *see also* SSR 85–15, 1985 WL 56857, at *7 (Jan. 1, 1985).  The ALJ is required to provide "a narrative discussion describing how the evidence supports each conclusion" and to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered or resolved."  SSR 96–8P, 1996 WL 374184, at *7 (July 2, 1996).  In determining a claimant's RFC, the ALJ must also "consider all [of the claimant's] symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the

objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). "When the medical signs or laboratory findings show that [the claimant has] a medically determinable impairment(s) that could reasonably be expected to produce . . . symptoms, such as pain, [the ALJ] must then evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [the claimant's] symptoms limit [his or her] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).

The RFC is an issue reserved to the judgment of the Commissioner and therefore no special weight needs to be given to any particular source. 20 C.F.R. §§ 404.1527(d), 416.927(d). However, "[b]ecause an RFC determination is a medical determination, an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 347 (E.D.N.Y. 2010) (citations omitted). The ALJ should evaluate every medical opinion "regardless of its source," and determine how much weight to give each opinion based on the factors provided by 20 C.F.R. §§ 404.1527(c) and 416.927(c). The Second Circuit has routinely held that "failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." *Correale-Englehart*, 687 F. Supp. 2d at 422.

1. Mental RFC

The "special technique" applied at steps two and three assesses the functional effects of a claimant's mental impairments, but it "is entirely separate and analytically distinct from, a *subsequent* determination of mental *residual functional capacity*[,]" where the focus is on "an assessment of an individual's ability to do sustained *work-related* physical and mental activities in a *work setting* on a regular and continuing basis." *Avant v. Colvin*, No. 6:15-CV-06671 (MAT), 2016 WL 5799080, at *3 (W.D.N.Y. Oct. 5, 2016) (first quoting *Golden v. Colvin*, No. 5:12-CV-

665 (GLS)(ESH), 2013 WL 5278743, at *3 (N.D.N.Y. Sept. 18, 2013) (adopting report and recommendation) and then quoting SSR 96-8p (emphasis and alterations in original)).

Based on the conclusion that Plaintiff had an adjustment disorder, the ALJ determined that Plaintiff was "limited to simple, routine, and minimal decision-making jobs known as low stress-work," and work requiring minimal interaction with coworkers. (Tr. 14.) In making her mental RFC determination, the ALJ gave "limited" weight to Dr. Navarro's opinion that Plaintiff had cognitive and emotional limitations because Dr. Navarro was not a mental health specialist and because he did not refer Plaintiff to a psychiatrist. (Tr. 23.) The ALJ gave "some" weight to Dr. Kushner's consultative opinion that Plaintiff had moderate limitation in maintaining attention and concentration, relating adequately with others, and appropriately dealing with stress, but still found that Plaintiff's psychiatric problems were not significant enough to interfere with her daily functioning. (Tr. 24.) The ALJ gave "significant" weight to Dr. Efobi, the medical expert, who opined that Plaintiff had mild limitation in activities of daily living, moderate limitation in social functioning, mild limitation in concentration, and no episodes of decompensation. (Tr. 23.) The ALJ never discussed the opinion of the consultative psychiatrist, Dr. Kennedy-Walsh. (*See* Tr. 10–26.)

Plaintiff contends that the ALJ's determination as to her mental RFC lacks substantial support from the medical record and demonstrates the ALJ's failure to develop the record. (Dkt. 16–1 at 34.) Specifically, Plaintiff notes that the ALJ's mental RFC determination is solely based on the testimony of Dr. Efobi and that the ALJ disregarded the assessment by the SSA's own consultative examiner Dr. Kennedy-Walsh. (Dkt. 16–1 at 23, 34–35.) The Court agrees.

a. The ALJ Improperly Failed to Address Dr. Kennedy-Walsh's Opinion

As Plaintiff points out, the ALJ erred by failing to consider or weigh the opinion of consultative examining psychiatrist, Dr. Kennedy-Walsh. In determining a claimant's RFC, an ALJ must consider "all medical opinions received regarding the claimant." *Reider v. Colvin*, No. 15-CV-6157 (MWP), 2016 WL 5334436, at *5 (W.D.N.Y. Sept. 23, 2016) (quoting *Spielberg v. Barnhart*, 367 F. Supp 2d 276, 281 (E.D.N.Y. 2005) (citing 20 C.F.R. § 404.1527(d))). ALJs "may not ignore [opinions from State agency medical and psychological consultants] and must explain the weight given to these opinions in their decisions . . . ." *Reider*, 2016 WL 5334436, at *5 (quoting SSR 96-6, 1996 WL 374180, at *1 (July 2, 1996)); *see also Jermyn v. Colvin*, No. 13-CV-5093 (MKB), 2015 WL 1298997, at * 15 (E.D.N.Y. Mar. 23, 2015) ("[T]he ALJ is required to evaluate and weigh the medical findings of non-treating physicians." (citing 20 C.F.R. § 416.927 (c)); *Hill v. Astrue*, No. 11-CV-0505 (MAT), 2013 WL 5472036, at *12 (W.D.N.Y. Sept. 30, 2013) ("[W]ith regard to [the] consultative psychologist . . . , the ALJ failed to discuss his opinion or explain the weight, if any, accorded to it[;] [t]his is further error requiring remand.").

Dr. Kennedy-Walsh opined that Plaintiff had various moderate limitations in aspects that would affect Plaintiff's ability to work. For example, Plaintiff had moderate limitations in understanding and memory; moderate limitations in concentration and persistence; mild to moderate limitations in social interaction; and mild limitations in adaptation. (Tr. 149–50.) Plaintiff also had, according to Dr. Kennedy-Walsh, moderate limitations in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; and complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 150.) However, the ALJ's decision does not address Dr. Kennedy-Walsh's opinion at all. (*See* Tr. 10–

26.)  This failure to address Dr. Kennedy-Walsh's opinion is especially problematic because it was consistent with the opinion of the consultative psychologist, Dr. Kushner, Ph.D., who opined that Plaintiff had "mild to moderate limitations" maintaining a regular schedule, (Tr. 451), and also because there was no assessment of Plaintiff's functional limitations by Plaintiff's treating psychiatrist and psychologist.  *See Maldonado*, 2014 WL 537564, at *16 (finding that, "[i]n the absence of any treating mental health physician, ALJ should give greater weight to [the] assessment" of a consultative examining physician in determining claimant's mental health RFC than to the assessment of a non-examining, non-treating medical expert (citing *Fofana v. Astrue*, No. 10-CV-0071 (LTS)(THK), 2011 WL 4987649, at *20 (S.D.N.Y. Aug. 9, 2011) *report and recommendation adopted by* 2011 WL 5022817 (S.D.N.Y. Oct. 19, 2011))).  Because the ALJ's decision does not reflect that Dr. Kennedy-Walsh's opinion was considered, and because the mental RFC limitations assessed by Dr. Kennedy-Walsh were never accounted for in the ALJ's RFC determination, the ALJ's failure to consider Dr. Kennedy-Walsh's opinion was not harmless. *See Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 298 (W.D.N.Y. 2006) ("[W]ith no explanation provided, it is not possible for the [c]ourt to know why . . . the ALJ chose to disregard the evidence that was more favorable to plaintiff's claim[;] [h]er failure to reconcile the RFC assessment with medical source statements was error, and . . . the failure was not harmless."); *see also Jackson v. Colvin*, No. 1:14-CV-00055 (MAT), 2016 WL 1578748, at *4 (W.D.N.Y. Apr. 20, 2016) ("Further, because there was no treating physician's opinion detailing [P]laintiff's mental limitations, the ALJ was required to discuss and weigh the opinions of the consulting state agency psychologists in reaching a mental RFC finding.").

b. The ALJ's Mental RFC Finding Is Not Supported by Substantial Evidence

While not addressing any of Dr. Kennedy-Walsh's opinion, the ALJ gave "significant" and "great" weight to the assessment of the State agency medical expert, Dr. Efobi. (Tr. 22, 23.) This also is a ground for remand as Dr. Efobi did not examine Plaintiff and his assessment of Plaintiff's mental limitation is not supported by other evidence in the record.

When evaluating a mental disability, "it is improper to rely on the opinion of a non-treating, non-examining doctor because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient." *Fofana*, 2011 WL 4987649, at *20 (S.D.N.Y. Aug. 9, 2011) (quoting *Velazquez v. Barnhart*, 518 F. Supp. 2d 520, 524 (W.D.N.Y. 2007)), *report and recommendation adopted*, No. 10-CV-71 (LTS)(THK), 2011 WL 5022817 (S.D.N.Y. Oct. 19, 2011). "The conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little if any weight." *Savage v. Colvin*, No. 15-CV-5774 (JFB), 2017 WL 776088, at *10 (E.D.N.Y. Feb. 28, 2017) (quoting *Filocomo v. Chater*, 944 F. Supp. 165, 170 n.4 (E.D.N.Y. 1996)); *see also Roman*, 2012 WL 4566128, at *16 ("The medical opinion of a non-examining medical expert does not constitute substantial evidence and may not be accorded significant weight."); *Cabibi v. Colvin*, 50 F. Supp. 3d 213, 236 (E.D.N.Y. 2014) ("The general rule regarding the written reports of medical advisors who have not personally examined a claimant is that such reports deserve little weight in the overall evaluation of disability." (citing *Vargas v. Sullivan*, 898 F.2d 293, 295–96 (2d Cir. 1990))). However, "'the opinion of a non-examining consultant may constitute substantial evidence in support of the ALJ's determination where . . . other evidence in the record supports it.'" *Paz v. Comm'r of Soc. Sec.*, No. 14-CV-6885 (MKB), 2016 WL 1306534, at *18 (E.D.N.Y. Mar. 31, 2016) (quoting *Coburn*, 2009 WL 4034810, at *6).

The ALJ's mental RFC determination closely follows Dr. Efobi's opinion testimony given at the hearing. (*Compare* Tr. 14 (ALJ's conclusion that due to Plaintiff's *adjustment disorder*, Plaintiff is limited to low-stress work involving minimal interaction with coworkers), *with* Tr. 105–06 (Dr. Efobi's testimony that "the only real limitation . . . would probably be something around the social. . . . She would probably do best with minimal contact [at work].")). At the hearing, the ALJ explained that Dr. Efobi's opinion testimony would be subject to change given that Dr. Efobi gave his testimony without reviewing any records from Plaintiff's treating psychiatrist or psychologist. (Tr. 107.) After Dr. Efobi reviewed the additional record, he noted that the additional evidence did not change his opinion because the additional evidence was composed of mostly physical health records. (Tr. 1092.) However, a review of the additional evidence Dr. Efobi was given, *e.g.*, Exhibit 11F (Tr. 518–1091), indicates that the additional evidence included a significant amount of Plaintiff's mental health record, including Plaintiff's treating psychiatrist and psychologist's diagnosis that Plaintiff suffers from "Major Depressive Disorder, Recurrent," and that Plaintiff received psychotherapy and was prescribed medication for anxiety. (*See, e.g.*, Tr. 536–39 (Treatment Plan for Plaintiff's major depressive disorder), Tr. 953 (prescribing Remeron for anxiety, in addition to antidepressant medication Plaintiff was taking at the time).) In light of Dr. Efobi's adherence to his original diagnosis of adjustment disorder— even after receiving Plaintiff's mental health records indicating a diagnosis of, and treatment for, major depressive disorder diagnosis by Plaintiff's treating psychiatrist and psychologist—there is reason to question whether Dr. Efobi actually reviewed, or how thoroughly he reviewed, the additional medical evidence he was provided before concluding that his opinion testimony need not be changed. At a minimum, the ALJ should have required Dr. Efobi to explain why he disagreed with the diagnosis rendered by Plaintiff's two treating mental health professionals.

Instead, in her decision, the ALJ concluded that Dr. Efobi's opinion was "well explained as Dr. Efobi provided detailed testimony with citation to the record," and that it was "generally consistent with the record overall showing somewhat limited treatment until January 2014 and that the claimant reported improvement." (Tr. 23–24.) However, the only time Dr. Efobi provided testimony with citation to the record was at the hearing, which was based on an admittedly incomplete record that, *inter alia*, lacked the treatment information from Plaintiff's psychiatrist and psychologist. (*See* Tr. 100–12.)

Moreover, "[b]ecause stress is 'highly individualized,' mentally impaired individuals 'may have difficulty meeting the requirements of even so-called 'low-stress' jobs,' and the Commissioner must therefore make specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect [her] ability to work." *Marthens v. Colvin*, No. 3:15-CV-535 (CFH), 2016 WL 5369478, at *12 (N.D.N.Y. Sept. 22, 2016) (quoting *Paquette v. Colvin*, 7:12-CV-1470 (TJM), 2014 WL 636343, at *7 (N.D.N.Y. Feb. 18, 2014) (adopting report and recommendation)). While the record indicates that Plaintiff reported improvement with respect to her ability to handle stress, it also indicates that Plaintiff continued to be overwhelmed and depressed when confronting psychosocial stressors (Tr. 569–70), and that both Drs. Ruiz and Nair found continued treatment was necessary for Plaintiff (Tr. 580, 609). Such evidence suggests that Plaintiff may have limitations in her ability to cope with certain triggers or stress that could also affect her ability to work. Nevertheless, neither Dr. Efobi's testimony nor the ALJ's decision addressed such evidence.

The Court finds that Dr. Efobi's opinion as to Plaintiff's mental functioning abilities was not supported by substantial evidence, given the unexplained and significant difference between Dr. Efobi's diagnosis and Drs. Ruiz's and Nair's diagnosis of Plaintiff, combined with the fact that

Dr. Efobi failed to address pertinent issues relevant to Plaintiff's ability to work, and only cited to the record prior to Plaintiff's supplementation of it.

>    c.    The ALJ Failed to Develop the Record With Regard to Plaintiff's Mental RFC

Plaintiff asserts that the ALJ failed to develop the record because she failed to obtain mental RFC assessments from Plaintiff's treating psychiatrist or treating psychologist, Drs. Ruiz and Nair, respectively. The Court agrees; given that there was insufficient medical evidence supporting the ALJ's mental RFC determination, the ALJ had a duty to develop the record.

While a "claimant has the general burden of proving that he or she has a disability within the meaning of the Act, . . . because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Burgess*, 537 F.3d at 128 (alteration, citation, and internal quotation marks omitted). This duty applies "even where the applicant is represented by counsel . . . ." *Eusepi v. Colvin*, 595 F. App'x 7, 9 (2d Cir. 2014). "An ALJ does not need to affirmatively obtain the RFC opinion of a treating physician where there are no obvious gaps in the medical history." *Gonzalez v. Colvin*, No. 15-CV-2159 (MKB), 2016 WL 5477591, at *18 (E.D.N.Y. Sept. 28, 2016) (citing *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015)).

While a "record is not necessarily incomplete simply because it lacks an RFC assessment[,] . . . where an RFC assessment is lacking, the ALJ must take the affirmative step of requesting one from a treating source before making a determination as to the plaintiff's disability." *Davilar v. Comm'r of Soc. Sec.*, No. 15-CV-7200 (LDH), 2017 WL 1232490, at *5 (E.D.N.Y. Mar. 31, 2017) (citations omitted).

>    The commissioner's own regulations . . . , 20 C.F.R. § 404.1513(b)(6) states that a treating source[']s medical report should include "[a] statement about what [the claimant] can still do despite [his or her] impairment(s)." Although the regulation

provides that the lack of such a statement will not render a report incomplete, it nevertheless promises that the Commissioner will request one.

*Robins v. Astrue*, No. 10-CV-3281 (FB), 2011 WL 2446371, at *3 (E.D.N.Y. Jun. 15, 2011).

"Social Security Ruling 96-5p confirms that the Commissioner interprets those regulations to mean that '[a]djudicators are generally required to request that acceptable medical sources provide these statements with their medical reports.'"  *Id.*  Although the ALJ obtained medical records from Plaintiff's psychiatrist and psychologist (Tr. 216), she did not obtain from them assessments of Plaintiff's mental limitations related to her ability to work.  (*See* Tr. 22 ("No psychiatric treating source has rendered a Mental Residual functional capacity.").)  Nevertheless, the record shows that the ALJ never requested a statement as to Plaintiff's functional limitations from either Dr. Ruiz or Dr. Nair, and instead made a mental RFC determination based significantly on Dr. Efobi's opinion, with little weight being given to the opinion of Dr. Kushner, the consultative psychologist who examined Plaintiff, and no consideration at all being given to the opinion of Dr. Kennedy-Walsh, the consultative psychiatrist.  This was reversible error.  *See Johnson v. Astrue*, 811 F. Supp. 2d 618, 629–31 (E.D.N.Y. 2011) (remanding and directing the ALJ to develop the record by obtaining RFC assessments from claimant's treating sources, even though the record contained over one-hundred pages of well-documented medical evidence covering over a three-year period); *Robins*, 2011 WL 2446371, at *4 (rejecting the Commissioner's argument that the ALJ adequately developed the record by obtaining medical records where the ALJ did not attempt to obtain medical *opinions* from claimant's treating physicians).[29]

---

[29] As the Commissioner points out, the Second Circuit found in *Tankisi v. Comm'r of Soc. Sec.,* that it is inappropriate to remand solely because the ALJ had failed to request medical opinions in assessing residual functional capacity.  *See Tankisi.*, 521 F. App'x 29, 34 (2d Cir. 2013).  But, in *Tankisi*—even though the record did not contain formal opinions regarding the claimant's RFC from her treating physicians—the record "include[d] an assessment of [the

Furthermore, to the extent the ALJ discounted Dr. Kushner's opinion because, *inter alia*, it was unclear whether Dr. Kushner examined any medical evidence before rendering his opinion (Tr. 22), the ALJ should have sought clarification as to the evidence Dr. Kushner reviewed. *See Maldonado*, 2014 WL 537564, at *16 ("The ALJ had an affirmative duty to develop the record and use reasonable efforts to seek the additional information from [the examining medical source] that would clarify his RFC assessment."). The ALJ's failure to do so warrants remand of this matter. *See Davilar*, 2017 WL 1232490, at *5; *Siegmund v. Colvin*, 190 F. Supp. 3d 301, 309 (E.D.N.Y. 2016) (remanding and noting, "given the lack of reports setting forth the opinion of Plaintiff's treating physicians as to her RFC, the ALJ was required to make reasonable efforts to obtain such reports"); *see also Johnson v. Barnhart*, No. 02-CV-1704 (NGG), 2004 WL 725309, at *3 (E.D.N.Y. Mar. 8, 2004) (remanding where the ALJ "should have made efforts to obtain from the plaintiff's psychiatrist or psychologist a more detailed description of the plaintiff's limitations").

                    *                    *                    *

On remand, the ALJ should evaluate Dr. Kennedy-Walsh's opinion and identify and explain the weight, if any, accorded to that opinion. If the ALJ rejects Dr. Kennedy-Walsh's opinion, the ALJ should explain, in accordance with SSR 96-6 and 96-9p, why the opinion is not incorporated into the RFC assessment. The ALJ should also further develop the record and seek assessments of Plaintiff's mental limitations from Plaintiff's treating psychiatrist and/or psychologist. To the extent the basis of Dr. Kushner's opinion as to Plaintiff's mental RFC is unclear, the ALJ should develop the record and seek clarification from Dr. Kushner. Moreover,

---

claimant's] limitations from a treating physician." *Id.* Here, neither of Plaintiff's treating mental health sources, Dr. Ruiz and Dr. Nair, provided an assessment of her mental limitations.

the ALJ should consider making specific findings about the nature of Plaintiff's ability to handle stress, potential stress-triggers, and whether such factors would affect Plaintiff's ability to work on a sustained basis.[30]

## 2. Physical RFC

The ALJ found that Plaintiff could work at the "light" exertional level as defined in 20 C.F.R. § 416.967(b), *i.e.*, that she was capable of sitting, standing, and walking for six hours in an eight-hour workday, and lifting no more than twenty (20) pounds at a time with frequent lifting or carrying of objects weighing up to ten (10) pounds. Plaintiff asserts that the ALJ failed to develop the record before making this RFC determination, incorrectly weighed Dr. Navarro's opinion based on a misunderstanding of his report, and that the determination was not supported by substantial evidence. (Dkt. 16–1 at 32–33.) For the reasons stated below, the Court finds that the ALJ erred by improperly discounting Dr. Navarro's opinion, failing to consider relevant evidence, and failing to develop the record with respect to Plaintiff's physical functional limitations.

### a. The ALJ Erred by Discounting Dr. Navarro's Opinion Based on an Incorrect Understanding of the Record

As previously noted, Dr. Navarro from FedCap opined that Plaintiff had limitation in standing, walking, pushing, pulling, sitting, reaching, kneeling, squatting, and bending. (Tr. 490–

---

[30] The Court need not address Plaintiff's other arguments as to the error committed by the ALJ as some of those arguments are not fully developed, and the Court remands the case for a new hearing on other grounds. For example, Plaintiff also argues—relying on *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 515–16 (S.D.N.Y. 2003)—that her case must be remanded because a "mental RFC must be expressed in terms of the following work-related functions: understanding, carrying out, and remembering instructions; using judgment in making work-related decisions; responding appropriately to supervision, co-workers and work situation; and dealing with changes in a routine work setting," and that the ALJ failed to provide a detailed "function-by-function" assessment (Dkt. 16-1 at 23, 34). The Second Circuit, however, has held that the failure to conduct a function-by-function analysis is not a *per se* ground for remand. *Cichocki v. Astrue*, 729 F.3d 172, 176–77 (2d Cir. 2013).

91.)  However, the ALJ gave the opinion "limited" weight, finding that it was "vague and poorly explained," that Dr. Navarro failed to review the entire record, and also that his findings on examination of Plaintiff was "normal."  (Tr. 23.)  An examination of Dr. Navarro's report, however, indicates that Dr. Navarro, upon examining Plaintiff, observed abnormal musculoskeletal functions in range of motion, strength, and tone.  (Tr. 490.)  Not only did Dr. Navarro note Plaintiff's report of back, joint, and leg pain, but the doctor also observed swelling, stiffness, and limitations of movement.  (Tr. 486.)  Remand is appropriate because the ALJ's explanation for rejecting Dr. Navarro's opinion was, in part, "factually flawed."  *See Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) (vacating district court's judgment and remanding to Commissioner for further proceeding where the ALJ's explanation for rejecting treating physician's opinion was "factually flawed").

Additionally, the ALJ failed to develop the record with respect to Dr. Navarro's medical opinion and assessment of Plaintiff's functional limitations.  To the extent the ALJ found Dr. Navarro's opinion vague and in need of further explanation, the ALJ should have sought additional information and clarification from Dr. Navarro.  *Maldonado*, 2014 WL 537564, at *16; *see also Kessler v. Colvin*, No. 14-CV-8201 (JPO), 2015 WL 6473011, at *5 (S.D.N.Y. Oct. 27, 2015) (finding that the ALJ had a duty to clarify inconsistencies where the ALJ gave "some weight" to a physician's opinion on the grounds that the physician "just 'checked the boxes' and drew conclusions that were inconsistent with his treatment notes").

b.    The ALJ Failed to Explain the Physical RFC Determination

An "ALJ must [ ] adequately explain his reasoning in making the findings on which his ultimate decision rests . . . ."  *Villareal v. Colvin*, No. 13-CV-6253 (LGS), 2015 WL 6759503, at *18 (S.D.N.Y. Nov. 5, 2015) (adopting report and recommendation).  While the ALJ's decision

summarizes, in detail, the medical evidence in the record in concluding that Plaintiff is limited to "light" work (*see* Tr. 18–22), it fails to explain how the ALJ's RFC finding related to this detailed summary of the medical evidence. In spite of the detailed summary of the record, it is not clear from the decision which medical evidence the ALJ specifically relied on in formulating the physical RFC finding. This is an independent reason for remand. *See Cross v. Colvin*, No. 15-CV-00878 (MAT), 2016 WL 6659095, at *2 (W.D.N.Y. Nov. 11, 2016) ("The ALJ issued a detailed RFC finding, and although he summarized the medical evidence in the administrative record, he did not explain how his detailed RFC finding related to the medical evidence . . . ."); *see also Glessing v. Comm'r of Soc. Sec.*, No. 13-CV-1254 (BMC), 2014 WL 1599944, at *9 (E.D.N.Y. Apr. 21, 2014) ("The problem . . . is that, although the ALJ certainly made *findings* as to claimant's limitations, the ALJ provided no *analysis* explaining upon what evidence those findings were based. Instead, the decision simply lists the ALJ's RFC findings, and then cites particular pieces of evidence in the record, without connecting the two in any way.").

While the Commissioner asserts that Dr. Wosnitzer's opinion that Plaintiff has "moderate" limitations in prolonged walking does not preclude light work (Dkt. 23 at 35), that alone is not sufficient for this Court to glean the ALJ's reasoning behind her physical RFC determination. *See Cross*, 2016 WL 6659095, at *2 ("[A]lthough a finding of 'moderate' limitations in [the] areas [of bending, lifting, prolonged standing, and prolonged sitting] can support a finding of light work, the ALJ must 'discuss and provide reasons tending to support the finding that, despite the moderate limitations . . . [the plaintiff] could still perform light work." (citing *Carroll v. Colvin*, No. 13-CV-456 (WMS), 2014 WL 2945797 (W.D.N.Y. Jun. 30, 2014))).

c. <u>The ALJ Failed to Develop the Record as to Plaintiff's RFC</u>

The ALJ also failed to develop the record adequately for purposes of determining Plaintiff's physical RFC.  Although Plaintiff's medical record is voluminous, save for the reports of Dr. Navarro from FedCap and two non-medical source State agency employees (disability analyst Nwafor and Interviewer Lachman), there is little indication in the record as to Plaintiff's physical capacity to perform work-related activities.  It is true, as the Commissioner noted, that some of the physical therapy notes indicate that Plaintiff had good balance, generally had strength that was "within normal limits," was able to walk independently using a cane, and reported her pain to have decreased to a level of 2/10 after one of the therapy sessions (*See* Tr. 712–13 (October 14, 2013 physical therapy notes), Tr. 868–69 (February 12, 2014 physical therapy notes), Tr. 974 (March 24, 2014 physical therapy notes).)  Moreover, the record indicates that Plaintiff did not report, to any of her physicians, that she experienced weakness in her legs.  (*See, e.g.*, Tr. 1173, 1274, 1352, 1729, 1789, 1914.)  But, based on the ALJ's decision, it is unclear how such evidence alone supported the ALJ's finding that Plaintiff is capable of sitting, standing, and walking for six hours in an eight-hour workday, and can also lift up to twenty (20) pounds at a time or carry up to ten (10) pounds, when Plaintiff also consistently reported to her physicians that her back and knee pain was exacerbated by sitting or standing.  (Tr. 867, 1250, 1576, 1636, 1943.)  Furthermore, nothing in the record suggests anything about Plaintiff's ability to lift or carry a certain amount of weight.

In light of conflicting medical evidence in the record, combined with the lack of explicit functional assessments by Plaintiff's treating physicians, the ALJ should have requested an RFC assessment from one of Plaintiff's many treating physicians who examined her on an ongoing

basis. [31]  *See Beller v. Astrue*, No. 12-CV-5112 (VB), 2013 WL 2452168, at \*18–19 (S.D.N.Y.

Jun. 5, 2013) (adopting report and recommendation that found the ALJ should have sought an RFC

assessment from plaintiff's treating physician where the record contained no treating physician

opinions regarding her physical abilities and only included a medical source statement regarding

plaintiff's physical limitations from a consultative examiner); *Aceto v. Comm'r of Soc. Sec.*, No.

08-CV-169 (FJS), 2012 WL 5876640, at \*16 (N.D.N.Y. Nov. 20, 2012) ("Since the ALJ had

nothing more than treatment records and consultative reports to review, he had an affirmative duty

to develop the record and request that Plaintiff's treating physicians assess her RFC."); *Walker v.

Astrue*, No. 08-CV-0828(A)(M), 2010 WL 2629832, at \*6 (W.D.N.Y. Jun. 11, 2010) ("[A]n ALJ

is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result[,]

an ALJ's determination of RFC without a medical advisor's assessment is not supported by

substantial evidence.  Where the medical findings in the record merely diagnose [the] claimant's

exertional impairments and do not relate these diagnoses to specific residual functional

capabilities[,] . . . [the Commissioner may not] make the connection himself." (quoting *Deskin v.

Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008)) (internal quotation marks

omitted)), *report and recommendation adopted*, 2010 WL 2629821 (W.D.N.Y. Jun. 28, 2010).[32]

---

[31] The September 25, 2013 consultative examination report indicates that "the treating source does not accept the state approved vendor fee."  (Tr. 145.)  However, it is unclear which treating physician this statement is referring to and whether it was the reason why none of Plaintiff's treating physicians provided a statement assessing Plaintiff's RFC.

[32] Moreover, even if the ALJ did err in determining Plaintiff's neck pain was not severe, remand would be appropriate because the ALJ did not account for any limitations stemming from Plaintiff's neck pain in making the RFC determination.  *See* 20 C.F.R. § 404.1545(a)(2) (requiring an RFC determination to account for limitations imposed by both severe and nonsevere impairments); *see also Paz*, 2016 WL 1306534, at \*14 (noting that where an ALJ "fails to account for any functional limitations associated with the [non-severe] impairments in determining the claimant's RFC, a court must remand for further administrative proceedings" (citing *Parker-Grose*, 462 F. App'x at 18)).

*      *      *

On remand, the ALJ should further develop the record by seeking opinions and assessments from either Drs. Dovnarsky, Cruz, Ortiz, or any other appropriate medical sources; address Plaintiff's neck pain and any resulting limitations to Plaintiff's work-related physical functioning; and clearly explain the rationale as to the physical RFC determination, specifically citing to medical evidence.[33]

### C.     Remaining Arguments

Plaintiff also argues that the ALJ improperly evaluated Plaintiff's credibility, failed to properly evaluate her chronic pain, and failed to consider the observations of Lachman, who noted Plaintiff's physical limitations.  Because the Court has determined that remand is appropriate to fully develop the record upon which the Listings, treating physician opinions, and RFC and credibility assessments are based, the Court need not address Plaintiff's remaining arguments. *Rosa v. Callahan*, 168 F.3d 72, 82 n.7 (2d Cir. 1999) ("Because we have concluded that the ALJ was incorrect in her assessment of the medical evidence, we cannot accept her conclusion regarding . . . credibility."); *Jackson*, 2014 WL 4695080, at *21 ("Given that the Court recommends remand for further development of the record, the Commissioner will be required to reassess both [plaintiff's] credibility and [his] RFC in light of the new evidence.").  On remand, the ALJ should consider these remaining arguments raised by Plaintiff when re-examining the medical evidence and reassessing Plaintiff's RFC and credibility.

---

[33] Because the ALJ did not address Plaintiff's neck pain and the mental RFC determination was not based on substantial evidence in the record, remand is appropriate—even though the ALJ included sedentary jobs at stage five of the analysis.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted. Pursuant to the fourth sentence of 42 U.S.C. § 405(g), the Commissioner's decision is vacated, and this matter is remanded for further administrative proceedings consistent with this Order. The Court also finds that remand to a new ALJ is appropriate in this case. While the decision to assign a case to a new ALJ on remand is generally left to the discretion of the Commissioner, the Court directs the Commissioner to assign a new ALJ in light of the *Padro* case. *See Arvanitakis v. Comm'r of Soc. Sec.*, No. 12-CV-1232 (CBA), 2015 WL 2240790, at *14 (E.D.N.Y. May 12, 2015). The Clerk of Court is respectfully requested to enter judgment accordingly.


SO ORDERED.


*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: September 28, 2017
      Brooklyn, New York